## S00A1416. GORDON v. THE STATE.
(541 SE2d 376)

THOMPSON, Justice.

Randy Lamar Gordon was convicted of malice murder in the beating death of Raymond Conway.[1] On appeal from the denial of his motion for new trial, Gordon challenges several evidentiary rulings of the trial court, and asserts that he was denied effective assistance of trial counsel. Finding no reversible error, we affirm.

Viewed in a light most favorable to the verdict, the evidence shows as follows: Just prior to midnight on October 31, 1984, Gordon and his cousin Barry Looney visited a game room where an argument ensued between Gordon and the victim, Raymond Conway, over a game of pool. Gordon insisted that he had won the game and he demanded Conway's watch as payment. Gordon and Looney both admitted to leaving the premises that night in Looney's car, accompanied by Conway. Conway was never seen alive again. One month later, two hunters discovered Conway's body at the bottom of a ten-foot well near an abandoned mill. The cause of death was blunt force trauma to the head.

After several months, the police investigation led to Gordon and Looney; and both men were interviewed in early 1985. Initially, Gordon denied having been at the game room on the night in question. In a second interview the next day, Gordon changed his story and admitted that he and Looney had in fact been on the premises. He explained that Conway approached them in the parking lot at closing time and asked for a ride to a friend's home; they agreed and the three drove off together in the front seat of Looney's car; but after driving only one-tenth of a mile, Conway asked to be let out of the car; whereupon Looney stopped the car in front of an abandoned service station to discharge Conway; and Gordon and Looney drove

---

[1] The crime occurred on or about October 31, 1984. An indictment was returned on October 17, 1995, charging Gordon and John Barry Looney with malice murder. An unopposed motion for severance of defendants was granted by the trial court. Gordon's trial commenced on December 8, 1997. He was found guilty by a jury on December 10, 1997, and was sentenced to life imprisonment on December 18, 1997. A motion for new trial was filed on December 31, 1997, amended on October 7, 1998, and denied on January 5, 2000. An order permitting an out-of-time appeal was entered on February 23, 2000. Gordon's notice of appeal was timely filed on March 22, 2000. The case was docketed in this Court on May 9, 2000, and was submitted for decision on briefs on July 3, 2000.

directly home.

Based on information developed by the police over the following years, an indictment was returned in July 1995, charging Gordon and Looney with Conway's murder. At trial, Gordon's former wife, Charlene Hare, testified that Gordon told her he beat Conway to death on Halloween night in 1984, and that he concealed the body in the well. A witness who observed Looney's car leave the game room on the night in question testified that the car proceeded past the abandoned service station without stopping, and it continued up the road. There was also testimony that Gordon had fished at the abandoned mill as a teenager, and he was seen with Conway's watch following his disappearance.

After his arrest in 1995, Gordon told his mother, "don't worry, Mama, I didn't do it, Barry [co-defendant Looney] did." He also revealed to a group of acquaintances that he could get away with anything he wanted, "even murder."

1. Gordon challenges the sufficiency of the evidence under the standard of *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). The jury was authorized to consider Gordon's statement that he beat the victim to death; forensic evidence regarding the manner of death which was consistent with Gordon's admission; evidence that Gordon argued with Conway at the game room; as well as Gordon's testimony that he, Looney, and Conway left the game room together and drove away in Looney's car on the night of Conway's disappearance. The evidence, although largely circumstantial, was sufficient to authorize a rational trier of fact to find Gordon guilty beyond a reasonable doubt of malice murder. *Jackson v. Virginia*, supra. See also *Brinson v. State*, 268 Ga. 227 (486 SE2d 830) (1997).

2. Gordon challenges the admissibility of certain testimony on hearsay grounds.

(a) Over objection, State's witness Gary Larson was permitted to testify to a conversation he had with a woman which took place in Gordon's presence. Larson testified that the woman stated that Gordon had placed a paper bag over a man's head and beat him, and that Gordon responded to the statement by admonishing the woman to "shut up." Gordon submits that the testimony should have been excluded under *Jarrett v. State*, 265 Ga. 28 (453 SE2d 461) (1995), as an impermissible comment on the defendant's silence.

Although *Jarrett* prohibits a witness in a criminal trial from testifying as to a declarant's statements based on the acquiescence or silence of the accused, such statements are admissible where the defendant adopts the statements as his own by his responses. *Carruthers v. State*, 272 Ga. 306 (528 SE2d 217) (2000). Here Gordon responded to the statement by telling the declarant to keep quiet, thus rendering the statement admissible under *Carruthers*.

(b) Gordon asserts that the testimony of GBI agent Gary Hughes contained inadmissible and prejudicial hearsay.

Several months after Conway's murder, agent Hughes interviewed Gordon's former girlfriend, Lonie Bell Sanders, who gave two separate statements to the officer. Sanders was called as a witness for the State at trial. She was asked whether she remembered being interviewed by agent Hughes on two occasions in 1985; she replied, "just barely." In attempting to remind Sanders of the interviews, the prosecutor asked her whether she recalled contacting the sheriff concerning the Conway murder investigation. Sanders acknowledged that she had. She was then asked whether the sheriff referred her to the investigating officer. Sanders replied that "he might have," but she could not remember. The prosecutor followed with a series of questions concerning specific statements she made to agent Hughes during those interviews. She testified that the only information she recalled telling the agent is that she had observed Gordon wearing Conway's wrist watch at some time after the pool game; she could recall nothing more of those interviews.

Agent Hughes, who had testified previously, was recalled by the State to rebut Sanders' testimony. He was questioned about his interview with Sanders in July 1985.[2] Agent Hughes explained that Sanders had contacted the sheriff stating that she had information about Conway's murder, and that he (Hughes) was dispatched to interview her. Agent Hughes further testified that when he met with Sanders, she was reluctant to talk to him; but he reminded her that she had initiated a call to the sheriff stating that she had information concerning the crime; and he asked her why she now refused to talk. Sanders replied that Gordon had been in jail at the time she contacted the sheriff and now that he was out on bond she was afraid to say anything. She then went on to tell agent Hughes, that although "she didn't really know" that Gordon killed Conway, everybody "knew he did it"; that Gordon was "very dangerous"; and that he was seen wearing Conway's watch. Over an objection on hearsay grounds, the trial court allowed agent Hughes to testify to the statements Sanders made to him during the investigation.

Since Sanders acknowledged on direct examination that she had telephoned the sheriff concerning the murder investigation, agent Hughes' testimony concerning his conversation with the sheriff is merely cumulative of Sanders' testimony and could have had no material effect on the verdict. See *Felder v. State*, 270 Ga. 641 (8) (514 SE2d 416) (1999). Furthermore, the sheriff testified as a witness for the State and was subject to cross-examination by the defendant.

---

[2] It appears that Sanders' statement was not reduced to written form.

Likewise, because Sanders testified that she saw Gordon with Conway's watch, agent Hughes' statement to the same effect was not prejudicial. *Felder*, supra.

Sanders' explanation as to why she was reluctant to talk to agent Hughes is admissible under the rule in *Gibbons v. State*, 248 Ga. 858 (286 SE2d 717) (1982), and its progeny. "[A] prior inconsistent statement of a witness who takes the stand and is subject to cross-examination is admissible as substantive evidence." *Gibbons*, supra at 862. See also *Holiday v. State*, 272 Ga. 779 (2) (534 SE2d 411) (2000) (we continue to follow *Gibbons*); *Boyd v. State*, 230 Ga. App. 314 (1) (497 SE2d 3) (1998) (where witness testified he could not recall statements made to the police, officer was permitted to testify to the substance of those statements).

Although agent Hughes was permitted under *Gibbons*, supra, to testify to certain statements made to him by Sanders during the investigation, such statements are inadmissible where they contain "hearsay within hearsay." See *Harper v. State*, 152 Ga. App. 689 (1) (263 SE2d 547) (1979). Contrary to Gordon's argument, the double hearsay rule does not apply to Sanders' statement that everyone "knew he did it." "Hearsay evidence is that which does not derive its value solely from the credit of the witness but rests mainly on the veracity and competency of other persons." OCGA § 24-3-1 (a). Here, Sanders did not refer to an assertion by a third party; she merely related what she perceived to be the opinion of others. While the statement may have been offered to show the sentiment of the community, it was of such a speculative nature that it could not have been offered to prove the truth of the matter asserted. "[I]f the out of court declaration is admitted to prove the fact that the declaration was made and not to prove the truth of the declaration, it would not be hearsay." Rumsey, Agnor's Ga. Evid. (3rd ed.), § 1.1. Although the statement may have been excludable on other grounds, it was not subject to a hearsay objection.

(c) Over a hearsay objection, Charlene Hare was permitted to testify that she told Gordon's cousin about a newspaper story concerning a man who was killed on Halloween, and that the cousin responded, "don't say anything, but [Gordon] and [Looney] did it." The court reserved ruling pending a showing by the State that the testimony was tied to direct evidence. Hare then testified that as a result of the cousin's statement, she asked Gordon whether he had killed the victim; that he initially denied his guilt, but eventually told her that he beat Conway to death; that he also threatened to kill Hare if she were to divulge the information; and that she then reported the information to the police.

The court overruled the hearsay objection and allowed the testimony, not for its veracity or truthfulness, but to show Hare's conduct

in questioning Gordon and in ultimately notifying the police. The evidence was properly admitted under OCGA § 24-3-2. *Sturkey v. State,* 271 Ga. 572 (2) (522 SE2d 463) (1999); *Waldrip v. State, 267* Ga. 739 (12) (482 SE2d 299) (1997). In addition, the declarant testified as a witness at trial and denied having had the conversation with Hare. Thus, the evidence was also admissible as a prior inconsistent statement under *Gibbons,* supra.

(d) Conway's statement to the manager of the game room on the night in question, that "I can't stand the SOB," was the only evidence of animus between the victim and the defendant. The trial court correctly admitted the manager's testimony to show Conway's state of mind and attitude at the time of the crime. *Sturkey,* supra at 572 (2); *Dixon v. State,* 256 Ga. 658 (352 SE2d 572) (1987).

3. On cross-examination, the State asked Gordon several questions regarding his marriages and children. The trial court overruled Gordon's objection that the evidence impermissibly placed his character in issue. We find no error. First, the testimony was cumulative of other evidence regarding Gordon's background, which came in without objection. Nor do we perceive any prejudice which may have resulted in allowing Gordon to testify that he had been married twice and had fathered two children out of wedlock. The scope of cross-examination rests within the trial court's sound discretion. *Payne v. State,* 258 Ga. 711 (2) (373 SE2d 626) (1988). We find no abuse of that discretion.

4. Gordon asserts that he was denied effective assistance of trial counsel. To establish a constitutional deprivation, a defendant must show that counsel's performance was so deficient that it fell below an objective standard of reasonableness, and that the deficiency prejudiced his defense. *Strickland v. Washington,* 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984). "However, *Strickland* does not require that we inquire first into the alleged deficiency in counsel's performance, or even address [it] at all, if we find that no prejudice has been shown, that is, that there is no reasonable probability that the outcome would have been different" had counsel performed in some other manner. *Trammel v. State,* 265 Ga. 156 (1) (454 SE2d 501) (1995). The trial court relied on the prejudice prong of *Strickland* in denying Gordon's motion for new trial based on ineffective assistance of counsel.

(a) Gordon testified that he owned a wrist watch with a turquoise face which had been taken from him by police investigators, and later returned to him. He asserts that counsel was deficient in failing to properly subpoena an officer who purportedly took the watch from him in an effort to show that Gordon's watch was similar to Conway's. Gordon did not meet his burden of establishing that the failure to subpoena the officer prejudiced his defense.

(b) It is asserted that trial counsel was ineffective in failing to object to testimony that polygraph examinations were administered to some of Conway's acquaintances to ascertain their whereabouts on the night in question. The law is clear that absent a stipulation, the jury may be informed that a polygraph examination has been administered to explain an actor's motives or conduct only when the conduct and motives of the actor are relevant to the issues on trial. *Morris v. State*, 264 Ga. 823 (2) (452 SE2d 100) (1995). Assuming arguendo that the polygraph evidence was inadmissible in this instance, we find no reasonable probability that any alleged error on the part of counsel contributed to the outcome of the trial, in light of Gordon's admissions of guilt.

(c) On direct examination, agent Hughes testified to the substance of Gordon's custodial interviews, and then explained that he located and interviewed co-indictee Looney. When asked to summarize Looney's statement, agent Hughes prefaced his response by stating that Looney's statement "was similar to [Gordon's] but kind of opposite." Gordon claims that Hughes' prefatory comment constitutes improper opinion testimony under OCGA § 24-9-65, and that counsel was ineffective in failing to object to it. We disagree. Agent Hughes did not comment on the credibility of either suspect; he merely explained that there were some variations in their statements. In addition, because Gordon and Looney both testified as to the contents of their custodial statements, agent Hughes' statement was merely cumulative of other testimony. Thus, the State did not elicit inadmissible opinion evidence.

(d) Because we do not construe any testimony given by agent Hughes as an improper comment on Gordon's right to remain silent, we find no deficiency in counsel's failure to object to such testimony on that ground. See generally *Mallory v. State*, 261 Ga. 625 (5) (409 SE2d 839) (1991).

(e) On cross-examination Hughes was questioned repeatedly concerning the whereabouts of Mary Strickland at the time of the crime. He responded that because Strickland had not been with Conway in the days leading up to his death, investigators reached the conclusion that "she had nothing to do with" the crime. Assuming arguendo that counsel should have objected to the admissibility of agent Hughes' remark, we do not find the error to be outcome determinative in view of Gordon's admission.

(f) Gordon asserts that counsel was ineffective in failing to object to the admission of evidence which impermissibly placed his character in issue, or in eliciting the evidence himself.

During cross-examination of agent Hughes, counsel elicited testimony that the reason Gordon had initially denied having been at the game room on the night in question was because he was afraid

his parole would be revoked. When Gordon testified in own defense, he reiterated the same reason for the disparity in his two statements. Thus, it appears that counsel made the strategic decision to elicit the testimony to explain Gordon's conduct. Gordon has not "overcome the strong presumption that his attorney's performance fell within a wide range of reasonable professional conduct and that the attorney's decisions were made in the exercise of reasonable professional judgment." *Berry v. State*, 267 Ga. 476, 479 (4) (480 SE2d 32) (1997). See also *Ross v. State*, 231 Ga. App. 793, 799 (7) (499 SE2d 642) (1998).

Other passing references to Gordon's "probation," "drinking and driving," and having been "in jail," did not impermissibly place his character in evidence. See *Isaac v. State*, 269 Ga. 875 (5) (505 SE2d 480) (1998); *Johnson v. State*, 256 Ga. 604 (351 SE2d 623) (1987). Gordon has not shown attorney error or actual prejudice by counsel's failure to object in these instances.

On direct examination a witness for the State testified that Gordon told her he "could get away with anything he wanted to do, even murder." The statement was admissible as an admission by the accused against his penal interest. *Stanford v. State*, 272 Ga. 267 (4) (528 SE2d 246) (2000). Therefore, any objection to its admissibility would have been fruitless.

Finally, it is asserted that counsel rendered ineffective assistance in failing to object to the admission of a certified copy of Gordon's prior burglary conviction. While on cross-examination, Gordon testified that the reason he lied to the police concerning his whereabouts on the night in question was because he was on parole at the time. When asked why he was on parole, he responded, "I'm not sure . . . it could have been drinking and driving or it might have been a burglary charge that I had." When a defendant testifies and admits prior criminal conduct, the State is authorized to fully explore the issue on cross-examination. *Jones v. State*, 257 Ga. 753 (2) (b) (363 SE2d 529) (1988); *Francis v. State*, 266 Ga. 69 (2) (463 SE2d 859) (1995). Evidence of Gordon's burglary conviction was properly admitted.

5. Gordon's remaining enumerations of error were either not objected to in the trial court or not objected to on a ground asserted on appeal. Accordingly, these enumerations of error are waived. See generally *Spear v. State*, 270 Ga. 628 (5) (513 SE2d 489) (1999), and cases cited therein.

*Judgment affirmed. All the Justices concur, except Fletcher, P. J., who concurs in Divisions 1, 2 (a) and (d), 3, 4, 5, and in the judgment.*

DECIDED FEBRUARY 5, 2001.

*Finch & Finch, Walter R. Finch III, Debra M. Finch*, for appel-

lant.

Robert W. Lavender, District Attorney, Marsha D. Cole, Assistant District Attorney, Thurbert E. Baker, Attorney General, Wylencia H. Monroe, Assistant Attorney General, for appellee.