S03A0062. WHITE v. THE STATE.
(581 SE2d 18)

HINES, Justice.

Ernest White appeals his conviction for malice murder in connection with the fatal shooting of his brother, Wayne White. He chal-

---

lenges the admission into evidence of certain statements made by his wife and the sufficiency of the evidence at trial. Finding the challenges to be without merit, we affirm.[1]

On November 28, 1997, the day after Thanksgiving, Wayne White's sister, Keel, reported to the Dade County Sheriff's Department that Wayne was missing. He was last seen alive around 10:00 a.m. that day buying chicken feed at a local store. Wayne and his brother, Ernest White ("White"), lived on either side of their deceased father's property off of Wrights Drive on Sand Mountain. The next day, November 29, 1997, the sack of chicken feed was found on the steps of Wayne's mobile home and his truck was parked in the driveway. Also that day, the Dade County Sheriff's Department received a call about a deceased male found at a mobile home near Wayne's mobile home.

Police found Wayne's body on the deck of the neighboring mobile home. There was a pool of blood around the body, a pool of blood near the front door, and a trail of blood around the mobile home leading to Wayne's body. The body was very rigid and cold and appeared to have been there for some time. The victim was wearing a watch and ring and on the body was a billfold containing money.

The cause of Wayne's death was determined to be a shotgun wound to the chest. The comma-shaped exit wound was consistent with a deer slug fired from a 12 gauge shotgun. The location of the shotgun's wadding indicated the shot was fired from three to five feet from the victim.

Police secured the scene, but did not find a weapon, cartridges or slugs. White and his wife, Josephine, returned home while investigators were at the crime scene. White agreed to go to the sheriff's office to talk with an investigator. After White left, Josephine came out of their residence to inquire about her husband and an investigator told her that he had been taken to the sheriff's office for questioning because Wayne had been hurt and the police were investigating the crime. Josephine commented that "Wayne probably didn't see who done it to him." The investigator said, "did what," and Josephine responded, "shot him." At that point, police had not told Josephine

---

[1] The murder occurred on November 28, 1997. On October 12, 1998, a Dade County grand jury indicted Ernest White for malice murder, felony murder while in the commission of aggravated assault, and aggravated assault. He was tried before a jury November 9-11, 1998, and was found guilty of all charges. On November 11, 1998, White was sentenced to life imprisonment for malice murder. The trial court found merger with regard to the aggravated assault and the felony murder stood vacated by operation of law. See *Malcolm v. State*, 263 Ga. 369, 371-374 (4), (5) (434 SE2d 479) (1993). A motion for new trial was filed on November 25, 1998, amended on August 6, 2002, and denied on August 8, 2002. A notice of appeal was filed on September 5, 2002, and the appeal was docketed in this Court on September 17, 2002. The case was submitted for decision on November 11, 2002.

that Wayne was dead or that he had been shot.

White and Wayne had been involved in a dispute stemming from a water line. Prior to their father's death in August 1997, the brothers got water for their residences from a line running to the father's house; the water bill was in the father's name and the father would split the bill among the three. After the father's death, his home along with the water line burned. Wayne installed his own water meter and would not let White attach a line; the brothers had an altercation over it and both were taken to jail. The relationship between the brothers continued to deteriorate and they accused each other of various misdeeds, including breaking into each other's homes, stealing weapons, putting sugar in gas tanks, and spreading tacks in the driveway. Also, Wayne's dog was missing. A week or two before Wayne's death, White told a neighbor that he was trying to cause Wayne "all kind of trouble" by "doing things to him, stealing things," and that he was "just going to shoot [Wayne's] guts out." White told others that he was going to kill Wayne, and about a week before Wayne's death, White fired a shot into the ground near Wayne. Wayne told several people that he was afraid of White.

Sometime before noon on November 28, 1997, Wayne's neighbors heard gunfire, someone yelling for help, a person moaning, a woman's scream, and then two people arguing.

Before noon on November 28, 1997, White and Josephine arrived at Lula Holly's home. Josephine looked "scared to death" and after White left the room, she told Holly that she thought that White had "killed Wayne awhile ago." Josephine related that White left their home with a weapon, saying that he was "going to set a block up against the trailer door"; that Wayne "come by the road"; that a few minutes later she heard a gunshot and a scream; that White came back to the mobile home and told her that he "hid the gun in a brush pile in behind the trailer," and that he then suggested that they go to visit Holly. When White returned to where Josephine and Holly were talking, he stated, "after all of that . . . I'm not nervous."

Two or three weeks after Wayne's murder, White commented to Holly's grandson, "I told you I was going to kill him didn't I, I told you I was going to kill him." Two or three months after Wayne's death, Josephine told a neighbor, Johnson, that Wayne had been the cause of all the problems, that "if he hadn't caused [White] so may problems, that none of this would have happened," and that "it came to the point it was either [Wayne] or us." White gestured with his hand for Josephine to stop talking.

When interviewed by police, White denied any involvement in his brother's death and claimed that he had left his residence around 8:00 or 8:30 the morning of the murder and did not return until that evening. When the officer informed White that his brother was dead,

White cried and behaved very emotionally and nervous for about ten seconds and then stopped. White, at first, denied wanting to hurt his brother or ever pointing a weapon at him, but then White admitted having pointed a weapon at him.

White reported two weapons stolen in September 1997 and never notified police that they had been recovered. In late October 1997, White's neighbor found two "long guns" in some bushes near their homes. Because the neighbor had heard that White's weapons were missing, she notified him of her discovery and White claimed the shotguns as his. The neighbor later identified a 20 gauge shotgun seized from White's home as similar to one she had found; this shotgun was the same gauge as one of the weapons earlier reported by White as stolen. At Christmastime following Wayne's death, White sold his stepson a 12 gauge shotgun.

At trial, White admitted owning either a 20 gauge or 12 gauge shotgun at the time that his brother was killed, but he claimed it was in a pawnshop. He further testified that on November 28, 1997, he and his wife left their home around 9:00 a.m. to visit Holly and that they spent most of the day there. White denied having or firing any weapon that morning, denied killing his brother, and denied ever telling anyone that he wanted to kill his brother or that he had in fact killed him.

1. Prior to trial, Josephine filed an affidavit announcing her intention not to testify against her husband. White contends that the trial court erred by admitting four instances of hearsay statements by Josephine.

(a) First, White takes issue with the admission of Josephine's statements to police on the evening of November 29, 1997, prior to her being informed by police that her brother-in-law had been shot and killed, to the effect that her brother-in-law had been shot and that he probably did not see who had done it to him. The trial court found the statements to be admissible under both the res gestae and necessity exceptions to the admission of hearsay, after determining that Josephine was unavailable to testify due to her invocation of the spousal privilege and that there were guarantees of trustworthiness to the statements.

White concedes that his wife was unavailable to testify because of her invocation of the spousal privilege but urges that there was no showing that the statements were relevant and material and that they were more probative of a fact than other evidence that might have been offered; he also contends that the statements were not admissible as part of the res gestae.

However, it is unnecessary to consider whether the statements were part of the res gestae because they were admissible in evidence out of necessity. In order to admit a statement under the necessity

exception to the hearsay rule, the declarant must be unavailable, there must be particular guarantees of trustworthiness, and the statement must be shown to be relevant to a material fact and more probative of that material fact than other evidence that might be procured and offered. *Chapel v. State*, 270 Ga. 151, 155 (4) (510 SE2d 802) (1998). "The court must consider the totality of the circumstances that surround the making of the statement to determine its reliability. 'The test is whether "the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility." ' " *Yancey v. State*, 275 Ga. 550, 553 (2) (a) (570 SE2d 269) (2002). Here, the first element is satisfied; Josephine was unavailable as a witness because of her refusal to testify against her husband. See *Higgs v. State,* 256 Ga. 606, 608 (4) (351 SE2d 448) (1987). The trustworthiness of the statements is shown by the facts that they were made spontaneously, made a short time after the killing, and there was no apparent motive to lie in a manner implicating White; moreover, the statements were completely consistent with the evidence of the circumstances of the murder. Id. at 608 (5); see also *Yancey v. State*, supra at 555 (2) (c); *Cook v. State,* 273 Ga. 574, 576 (3) (543 SE2d 701) (2001); *Perkins v. State,* 269 Ga. 791, 795 (4) (505 SE2d 16) (1998). Finally, the fact that at the time Josephine made these statements, the police had not yet informed her that Wayne had been shot and fatally wounded renders her statements highly relevant to the question of how she knew about the shooting and more probative of that material fact than other evidence that the State could have offered. *Chapel v. State*, supra at 155 (4).

(b) White challenges the admission of testimony by his neighbor, Johnson, about the conversation she had with Josephine in White's presence in which Josephine stated that Wayne had been the cause of all their problems and that it had come to the point of being either Wayne or them. White then signaled Josephine to stop talking. White contends that the trial court erred in overruling his objection to the statements after finding that they were made in White's presence, and therefore, were admissible. But the contention is unavailing.

It is certainly true that in *Jarrett v. State*, 265 Ga. 28, 29 (1) (453 SE2d 461) (1995), this Court concluded that a witness in a criminal trial may not testify about a declarant's statements based on the accused's acquiescence or silence. *Luallen v. State*, 266 Ga. 174, 178 (5) (465 SE2d 672) (1996). However, the declarant's statements are admissible "where the defendant adopts the statements as his own by his responses." *Gordon v. State,* 273 Ga. 373, 374 (2) (a) (541 SE2d 376) (2001), citing *Carruthers v. State,* 272 Ga. 306 (528 SE2d 217) (2000). Here, White was far from silent; he actively responded to Josephine's statements by gesturing for her to keep quiet, thereby

arguably acknowledging that the inculpatory statements were true and that the information should not be disclosed. Thus, the statements were admissible for consideration by the jury. *Gordon v. State,* supra at 374 (2) (a).

(c) White next takes issue with the admission into evidence of Josephine's conversation with Holly on the morning of the murder to the effect that Josephine thought that White had shot Wayne because shortly after she saw Wayne, she heard a gunshot and a scream, and White hid his weapon and then asked to visit Holly. The trial court found that the statements had guarantees of trustworthiness and that they were made very close in time to the murder and were part of the res gestae.

The trial court's determination that the statements to Holly were part of the res gestae is not clearly erroneous. *Tesfaye v. State,* 275 Ga. 439, 443 (6) (569 SE2d 849) (2002). The statements explained the circumstances of the murder, were spontaneous and unsolicited, and were made immediately following the shooting, after White fled the scene. The statements also satisfied the criteria for admission out of necessity. *Yancey v. State,* supra at 555 (2) (c); *Chapel v. State,* supra at 155 (4). See Division 1 (a), supra.

(d) Lastly, White challenges the testimony of Investigator Hicks about Josephine's later account to him of the shooting. She related that she was outside the front door of the marital residence, White went behind the mobile home, Wayne drove up, a few minutes later she heard a shot and a moan, and White came back to the residence and told her that they "needed to go"; Josephine maintained that she did not see the shooting.

First, White made no objection to the investigator's testimony on redirect; therefore, his present complaint is not preserved for appellate review. *Gordon v. State,* supra at 379 (5). Moreover, even if the admission of these statements by Josephine was error, it would have to be deemed harmless because the statements were duplicative of other comments made by her which were properly admitted. See Division 1 (c) supra; *Woods v. State,* 275 Ga. 844, 850 (4) (573 SE2d 394) (2002); *Myers v. State,* 275 Ga. 709, 712 (2) (572 SE2d 606) (2002).

2. There is no merit to White's contention that the verdicts against him are contrary to the evidence, and that his conviction is without sufficient evidence to support it because the State's case was based upon circumstantial evidence and failed to exclude all other reasonable hypotheses save his guilt. White's conviction was not based solely on circumstantial evidence; there was ample direct evidence that he committed the murder, including his own inculpatory statements. The evidence was sufficient to enable a rational trier of fact to find White guilty beyond a reasonable doubt of the malice

murder of his brother. *Jackson v. Virginia,* 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

*Judgment affirmed. All the Justices concur, except Fletcher, C. J., and Hunstein, J., who concur specially.*

FLETCHER, Chief Justice, concurring specially.

The majority holds that a husband adopts his wife's statements as his own simply by gesturing for her to be quiet. Because this holding is neither logically nor factually supportable, I write separately in affirming the convictions.

The majority's holding that a husband's request of his wife to "shut up" actually means, as a matter of law, that he agrees with his wife is a remarkable interpretation of such an exchange. The relevant question for determining the admissibility of an alleged adoptive admission is "does the silence or conduct of the party, naturally and according to human experience, amount, under the circumstances, to an admission of what is said in his presence?"[2] The defendant's gesturing to his wife for her to stop talking to a neighbor about his brother does not naturally mean that he agrees with what she is saying. In fact, the usual human experience would consider such a gesture to mean that the husband *disagrees* with his wife's comments.

To the extent that *Gordon v. State*[3] supports the vast expansion of the use of adoptive admissions in a criminal trial, contrary to *Jarrett v. State*,[4] it should be overruled.

While these statements were erroneously admitted, the error was harmless in that the statements were not directly inculpatory and were cumulative of other evidence regarding the difficult relationship between the brothers.

I am authorized to state that Justice Hunstein joins in this special concurrence.

DECIDED MAY 19, 2003.

*Jennifer E. Hildebrand,* for appellant.

*Herbert E. Franklin, Jr., District Attorney, Thurbert E. Baker, Attorney General, Paula K. Smith, Senior Assistant Attorney General,* for appellee.

---

[2] *Giles v. Vandiver,* 91 Ga. 192 (2) (17 SE 115) (1893).

[3] 273 Ga. 373, 374 (2) (541 SE2d 376) (2001).

[4] 265 Ga. 28, 29 (453 SE2d 461) (1995) ("a witness in a *criminal* trial may not testify as to a declarant's statements based on the acquiescence or silence of the accused").