## S03A0688. WILSON v. THE STATE.
(587 SE2d 9)

HINES, Justice.

Brenda Wilson appeals her conviction for malice murder in connection with the fatal shooting of Charles Russell. She challenges the admission into evidence of certain testimony and a videotaped interview, the failure to grant her a new trial due to an alleged *Brady* violation, and the sufficiency of the evidence of her guilt. Finding the challenges to be without merit, we affirm.[1]

During the early morning hours of October 14, 1981, Charles Russell received a telephone call from his niece, Suzanne Johnson; he left his house on Old Cove Road ostensibly to take some vitamins or medicine to her. Russell got out of his car to open the gate across his driveway and was shot twice – once by a shotgun blast to the head that came from an elevated embankment next to the driveway, and once by a blast from a high velocity small caliber weapon through his back. Russell's wife heard a vehicle leaving the area after she heard shots fired. Russell managed to walk back to his house where he told his wife that "they" shot him, but he did not identify his assailants. Russell died shortly after his arrival at the emergency room of a local hospital.

Investigations at the crime scene turned up two different kinds of fresh cigarette butts in the wooded area next to the driveway; one set of butts was from brown cigarettes. Bushes and brush in the area had been trampled down. This and the number of cigarette butts found led police to believe that the assailant or assailants laid in wait for some time to attack Russell as he opened the gate that they had closed. Russell's car was found down an embankment covered in kudzu, approximately one-half mile from his home. Fingerprints were lifted from the steering wheel, but the prints did not match any of the initial suspects of the crime.

In August of 1983, a Georgia Bureau of Investigation (GBI)

---

[1] The murder occurred on October 14, 1981. On November 4, 1998, a Walker County grand jury indicted Wilson for malice murder, felony murder while in the commission of aggravated assault, aggravated assault, and possession of a firearm during the commission of a felony. She was tried before a jury March 23-26, 1999, and was found guilty of malice murder, aggravated assault, and possession of a firearm during the commission of a felony; she was found not guilty of felony murder while in the commission of aggravated assault. On March 26, 1999, Wilson was sentenced to life imprisonment for malice murder. The trial court found that the aggravated assault merged for the purpose of sentencing; the trial court also set aside the verdict for possession of a firearm during the commission of a felony after finding that such crime did not exist in Georgia in 1981. Wilson filed a motion for new trial on March 26, 1999, and an amended motion for new trial on March 25, 2002. A new trial was initially denied on March 28, 2002; however, on June 4, 2002, the trial court vacated the order because it was never served on counsel and again denied Wilson's amended motion for new trial. A notice of appeal was filed on July 2, 2002, and the appeal was docketed in this Court on January 22, 2003. The case was submitted for decision on March 17, 2003.

informant related that Wilson and Wilson's brother, Chris Johnson, were involved in Russell's murder, and the information was passed to the Walker County Sheriff's Office. However, no arrest was made, and the case remained unsolved.

In 1998, Mickey Barrett, a convict under a 90-year prison sentence, came forward with information about Russell's murder. Barrett gave a videotaped statement to police, stating that while at a motel in 1981, Wilson told him that she was involved in Russell's murder.

Suzanne Johnson gave a statement to police that Wilson told her that she and another person had closed Russell's gate and shot him twice when he attempted to open the gate across his driveway. Suzanne also related that Wilson had explained how she and the other assailant had parked their car near the murder scene so they could make a quick getaway, and that the two had taken Russell's car after the shooting and had done something to the accelerator to make the car "take off" and end up down the embankment.

Following the interview with Suzanne Johnson, police interviewed Wilson. She told them that she did not think that she had killed Russell, and if she did, she must have been drinking at the time. Police also conducted interviews with several other individuals who reported that Wilson had admitted to them her involvement in the murder and related details of the killing. Wilson was arrested for the murder.

At trial, the State presented evidence that in her late teenage years, Suzanne Johnson had lived with Russell and his wife, who were Johnson's aunt and uncle; during Suzanne's stay, Russell forced her to have a sexual relationship with him; Russell was a physically-imposing and controlling man who always carried a firearm; Russell was described as "mean" and "jealously possessive" of Suzanne; Russell seemed obsessed with Suzanne, and even after Suzanne moved out of his house, Russell often followed her and attempted to prevent her from having other relationships; at the time of the murder in 1981, Suzanne and Wilson were close friends; Wilson and her brother, Chris Johnson, made a deal with Suzanne; they would get rid of Russell in exchange for Suzanne marrying Chris Johnson "for life." Suzanne and Chris Johnson were married following Russell's death and remained married at the time of trial in 1999.

Davies, a former friend of Wilson's, who used to live with her, testified that Wilson told him that she had murdered a man and "had to wait for him and shot him." Spyies, a co-worker of Wilson's, testified that Wilson appeared at her door early one morning in October 1981 in a "[panic], uneasy, nervous" state, saying "We did it. We killed him. We killed him."; Wilson related details of the murder including that they shot the victim again because "the m___f___

wouldn't die"; Wilson told Spyies that she needed her for an alibi, i.e., to say that Wilson was at her house at the time of the murder; Spyies heard Wilson and Suzanne Johnson laughing about the murder at work.

The brown cigarette butts found at the crime scene were identified as the brand smoked by Wilson.

1. Wilson contends that the trial court erred by allowing the jury to view the police videotaped interview of Mickey Barrett because Barrett refused to testify at trial, and thus, was unavailable for cross-examination in violation of Wilson's right of confrontation. However, admission of the videotape fails to provide a basis for reversal of Wilson's conviction.

Barrett did not remain silent when he was called to the stand. He answered several questions from the State, and he completely denied having made any statement to police regarding the murder of Charles Russell.[2] Thus, contrary to Wilson's assertion, this was not a situation in which the State failed to elicit any in-court testimony with which the videotape could be inconsistent. Compare *Barksdale v. State*, 265 Ga. 9, 10 (2) (453 SE2d 2) (1995); see also *Thornton v. State*, 264 Ga. 563, 564 (2) (449 SE2d 98) (1994). In fact, quite the contrary. Barrett's blanket denial that he had spoken with police was wholly inconsistent with his entire videotaped statement, and therefore, the videotaped statement was admissible. *Gordon v. State*, 273 Ga. 373, 377 (2) (c) (541 SE2d 376) (2001); *Gibbons v. State*, 248 Ga. 858 (286 SE2d 717) (1982). The claim that Wilson's right of confrontation was violated likewise fails. "Even if a hearsay declarant is not subject to cross-examination at trial, the admission of the declarant's out-of-court statement does not violate the defendant's right of confrontation if the declarant's out-of-court statement meets the requirements of a firmly rooted exception to the hearsay rule. . . ." *Barks-*

---

[2] At trial, Barrett gave his name, and testified that he was then residing in jail, had been convicted of child molestation and sodomy in Walker County, and was awaiting transport into the state system to serve his 90-year sentence. The State asked Barrett if he recalled speaking to Agent Harris in connection with the case involving Charles Russell. Barrett responded that he did not have anything else to say. The trial court instructed Barrett to answer, and the State again asked him whether he had made a statement to police at the Walker County Sheriff's Department at a specific date and time in July 1998. Barrett denied that he ever made a statement to police regarding the Russell murder. He then refused to answer further questions by the prosecutor regarding the making of his statement to police, stating that he "just don't want to." Even so, the State asked Barrett if he was aware that his statement to police regarding the Russell murder had been recorded, and Barrett responded, "If you've got a recording why do you need me here?" The State then asked him if he had spoken to or knew Herschel Christopher Barrett, and he responded, "Yeah, I do." Barrett then refused to answer further questions by the State. On cross-examination, Wilson's attorney asked, "Mr. Barrett, if I were to ask you questions I assume you won't answer my questions either; is that correct?" Barrett responded, "Correct." Wilson's attorney declined to attempt to further question Barrett.

*dale v. State,* supra at 13 (2) (b).

2. Wilson also contends that the trial court erred in allowing into evidence hearsay testimony from Mickey Barrett's nephew, Herschel Barrett.[3] However, the challenge to the admission of the evidence as hearsay is waived because Wilson failed to make a contemporaneous objection to the evidence at trial. *Brinson v. State,* 276 Ga. 671 (581 SE2d 548) (2003); *Roseberry v. State,* 274 Ga. 301, 303-304 (553 SE2d 589) (2001).[4]

Any challenge to the evidence as violative of the right of confrontation fails. See *Aaron v. State,* 172 Ga. App. 700 (324 SE2d 564) (1984). The fact that a hearsay declarant is not subject to cross-examination at trial does not automatically equate with the violation of a defendant's right of confrontation; the admission of the declarant's out-of-court statement does not offend such right if the out-of-court statement is admissible under a firmly rooted exception to the hearsay rule *or* if the statement was made under circumstances showing particular guarantees of trustworthiness. *Barksdale v. State,* supra at 13 (2) (b). Mickey Barrett made the statements to his nephew Herschel under circumstances demonstrating particular guarantees of trustworthiness, including the fact that the two men were close, as demonstrated by Herschel's frequent visits to Mickey during Mickey's incarceration, and the fact that there was no apparent motive for Mickey to lie to Herschel about Wilson's murder of Russell. In fact, Herschel testified that when Mickey first told him about Wilson's statements regarding the murder, Mickey acted like he did not believe anything Wilson had said about it.

3. Wilson next contends that the trial court erred by refusing to grant her motion for new trial because the State failed to disclose latent fingerprint evidence in violation of *Brady v. Maryland,* 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963). She alleges that the State failed to properly inquire whether the latent prints that were lifted from the victim's vehicle still existed, and that at trial the State relied upon the false testimony of a GBI agent that the latent print evidence no longer existed. But the record does not support these allegations; there is no evidence of a lack of diligence by the State in inquiring about the status of the latent prints or of any deliberate falsehood regarding their existence.

The record shows that at the time of Wilson's trial, all parties

---

[3] Herschel Barrett related, inter alia, that his uncle told him that Wilson stated that she had killed Charles Russell, that his uncle referred to Wilson as the "Cove Road Killer, CRK," and that Wilson laughed about the reference.

[4] The record does not support a finding that there was a continuing objection by the defense which would include the now objected-to testimony by Herschel Barrett. *State v. Larocque,* 268 Ga. 352, 353 (489 SE2d 806) (1997).

believed that the latent print evidence had been destroyed. Although 18 years had gone by since Russell was murdered, GBI Agent Harris inquired of the state crime lab whether the latent prints still existed so that they could be compared with Wilson's fingerprints. At trial, Harris testified that he was informed that the evidence had been destroyed. It was only after Wilson's trial and conviction that Harris learned that the latent prints had not been destroyed, and it was discovered that the prints did not belong to Wilson.

In order to demonstrate a *Brady* violation, Wilson had to show that: (1) the State possessed information favorable to Wilson; (2) Wilson did not possess the evidence nor could she obtain it with due diligence; (3) the prosecution suppressed the evidence; and (4) a reasonable probability exists that the outcome of the trial would have been different had the evidence been disclosed. *Watkins v. State*, 276 Ga. 578, 583 (4) (581 SE2d 23) (2003). Even assuming that the latent print evidence can accurately be characterized as exculpatory of Wilson's involvement in Russell's murder, the circumstances simply do not allow a finding of a *Brady* violation on the part of the State.

4. Finally, Wilson fails in her contention that the evidence at trial, which she characterizes as purely circumstantial, was insufficient to support her conviction. Multiple witnesses testified about Wilson's admissions of her participation in the fatal shooting. This testimony was direct evidence of Wilson's guilt. OCGA § 24-1-1 (3);. *Brown v. State*, 251 Ga. 598, 601 (4), n. 3 (308 SE2d 182) (1983); *Fields v. State*, 221 Ga. 307, 309 (144 SE2d 339) (1965). And the credibility of the witnesses was a matter for the jury to determine. *Rucker v. State*, 272 Ga. 750, 752 (2) (534 SE2d 71) (2000). The evidence, which was both direct and circumstantial, was sufficient to enable a rational trier of fact to find Wilson guilty beyond a reasonable doubt of the malice murder of Charles Russell. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

*Judgment affirmed. All the Justices concur, except Sears, P. J., who concurs in Divisions 3 and 4 and in the judgment, and Fletcher, C. J., and Benham, J., who dissent.*

FLETCHER, Chief Justice, dissenting.

After one of the State's most important witnesses, Mickey Barrett, refused to testify at trial, the State introduced a videotaped statement from him that he had given to police on a prior occasion. The majority concludes that Barrett's videotaped statement was not inadmissible hearsay because it was properly introduced as a prior inconsistent statement. Because Barrett did not give any testimony at trial that conflicted in any manner with the substance of his prior videotaped statement, however, the improper introduction of Barrett's videotaped statement violated Wilson's right to confrontation.

Therefore, I dissent.

In the videotaped statement, Barrett told police that Wilson had informed him that she had committed the crime. Barrett gave police the statement because he sought favorable treatment from the State with respect to his own 90-year sentence for child molestation. At trial, however, Barrett was absolutely uncooperative and refused to testify. At one point while he was on the stand, Barrett said that he had not given the police any statement. When confronted by the existence of the videotaped statement, Barrett said "If you've got a recording, why do you need me here?" The overall effect of Barrett's testimony was not to deny that he had been involved in the investigation, but only that he refused to cooperate any further.

The majority erroneously concludes that Barrett's videotaped statement qualifies as a prior inconsistent statement. Although Barrett did testify that he had not given a prior statement to police, at no point during his trial testimony did Barrett contradict the substance of his prior statement. In *Gibbons v. State*, relied upon by the majority, this Court upheld the introduction of a prior inconsistent statement after the witness testified that he had never given any prior statement to police *and* that the defendant had never incriminated himself to the witness.[5] In the prior statement in that case, the witness told police that the defendant had told him of his involvement in the crime.[6] Therefore, the testimony in *Gibbons* was inconsistent not only with the fact that a prior statement had been given, but also with the substance of that statement. In this case, Barrett never contradicted the substance of his prior statement.

This situation is also distinguishable from the one we addressed in *Gordon v. State*, also relied on by the majority.[7] In *Gordon*, this Court affirmed a trial court's decision to allow a witness to testify that the defendant's cousin had told her that the defendant had committed the crime.[8] The defendant's cousin had previously testified and had denied having that specific conversation with the witness about the defendant.[9] In effect, therefore, the defendant's cousin told the jury that he had never told the witness that the defendant committed the crime, thus casting doubt on whether or not the incriminating conversation had ever occurred. In this case, however, Barrett never told the jury that Wilson had not incriminated herself to him. The conversation that was denied in *Gordon* was very different, therefore, from the one Barrett denied having in this case. In addi-

[5] 248 Ga. 858, 863 (286 SE2d 717) (1982).
[6] Id. at 861.
[7] 273 Ga. 373, 377 (541 SE2d 376) (2001).
[8] Id.
[9] Id.

tion, Barrett's limited testimony would not have left the jury with the impression that he never spoke to police about Wilson, but rather, that he simply refused to cooperate with the State any further.

This situation is properly controlled by *Barksdale v. State*, in which this Court reversed a conviction because the trial court erroneously allowed the introduction of a witness's prior statement after that witness refused to testify at trial.[10] We reasoned that "because [the witness] refused to answer any questions and thus gave no testimony in court with which the prior statement could be judged to be inconsistent, [the witness's] videotaped statement was inadmissible as a prior inconsistent statement under *Gibbons*."[11] Under the *Barksdale* rationale, that Barrett not only refused to testify but also half-heartedly denied giving a prior statement to police does not render the substance of that prior statement admissible. If Barrett had also stated that the defendant had not incriminated herself to him, his prior statement would be admissible under *Gibbons*. Because Barrett gave no testimony that contradicted his prior statement to police, that prior statement was inadmissible hearsay.

The majority is correct that the admission of a declarant's out-of-court statement does not violate the defendant's right to confrontation if the out-of-court statement meets the requirements of a firmly rooted exception to the hearsay rule or was made under circumstances demonstrating particular guarantees of trustworthiness.[12] The statement introduced in this case from an incarcerated child molester serving a 90-year sentence and seeking favorable treatment from the State, however, contains no such guarantees of reliability. Therefore, it qualifies under no exception to the hearsay rule, and Wilson's right to confrontation was violated by the admission of the videotaped statement.

The majority also concludes that the admission of hearsay testimony from Mickey Barrett's nephew, Herschel Barrett, did not violate Wilson's right to confrontation because the circumstances under which the statements were allegedly made to Herschel demonstrated particular guarantees of trustworthiness. The circumstances described by the majority, however, do not create the inherent indicia of reliability necessary to overcome the defendant's right to confrontation.

Because Mickey Barrett's videotaped statement to police did not qualify as a prior inconsistent statement, Wilson's right to confrontation was violated by the improper admission of that statement. Accordingly, I dissent.

---

[10] *Barksdale v. State*, 265 Ga. 9 (453 SE2d 2) (1995).
[11] Id. at 11; see also *Farmer v. State*, 266 Ga. 869 (472 SE2d 70) (1996).
[12] *Barksdale*, 265 Ga. at 13.

I am authorized to state that Justice Benham joins in this dissent.

DECIDED SEPTEMBER 22, 2003.

*Jennifer E. Hildebrand,* for appellant.

*Herbert E. Franklin, Jr., District Attorney, Chris A. Arnt, Assistant District Attorney, Thurbert E. Baker, Attorney General, Jason C. Fisher, Assistant Attorney General,* for appellee.