A89A0850. GLOVER v. THE STATE.
(386 SE2d 699)

BIRDSONG, Judge.

Ernest Glover appeals his conviction of armed robbery and possession of a firearm during the commission of a felony.

On October 10, 1986, Leland Nettles, the manager of the Comet Oil Station in Savannah, Georgia, was robbed at gunpoint by two men. Moments after the robbery, Richard Spencer and appellant Ernest Glover were arrested. Appellant Glover was indicted for armed robbery, aggravated assault and possession of a firearm during the commission of a crime. During the trial of the case, the trial court directed a verdict of acquittal on the count for aggravated assault. The jury returned a verdict of guilty on the remaining counts.

Savannah Police Officer Leonard Harris testified that in response to a radio call he proceeded to the Comet Oil Station on Waters Avenue in Savannah at about 8:30 p.m., October 10, 1986. Immediately upon arriving at the store, he saw appellant inside the store, along with the other robber (Spencer) and the victim. He testified that he knew appellant Ernest Glover and in fact had known him "[p]ractically all my life." Harris also knew the second of the two robbers, Richard Spencer; he saw a gun in Spencer's hand. The robbers and the victim came running out of the business; Officer Harris tackled Spencer as he ran. Another policeman chased Glover. Officer Harris found a gun in Spencer's pocket and turned it over to the store clerk to guard Spencer. Moments later, he saw the other policeman, Officer Mack, and appellant scuffling on the ground near the store.

The victim, Leland Nettles, testified that at about 9:00 p.m. on October 10, 1986, two black males came into the Comet Oil Station. One ordered a couple of packs of cigarettes. When Nettles opened the cash register, "one male came around behind the counter with a gun and told me not to close the drawer." The man struck Nettles in the head with a gun and took the money from Nettles' left front pocket. The man pulled the hammer back on the gun, threatening to shoot Nettles if he did not open the floor safe. The other man (appellant) said "shoot the son of a b. . . and let's go." After money was taken, appellant told the gunman, "Let's go. They're outside."

The victim had activated a silent alarm during the robbery; the police were already outside when the two robbers left the store with Nettles running behind them. The two robbers left the store in the same direction but Spencer was caught immediately. Minutes later,

appellant Glover was brought back to the scene by the police and Nettles identified him as the other robber. On cross-examination, the victim repeated that it was appellant who urged Spencer to shoot him.

Police Officer Mack testified he was dispatched to the Comet store after the silent alarm went off and arrived shortly after Officer Harris. Mack saw two black men run from the store and head south. One of the men (Spencer) was caught almost immediately by Harris and Officer Mack pursued appellant for a "minute and a half." Mack testified the man he chased from the store that night was appellant Ernest Glover, whom he already knew by face. When he captured Glover, they tussled, and then engaged in a second chase. When he was caught again, appellant wrestled the policeman, seizing the officer's wrist and handgun. During the chase, defendant appeared to be carrying a plastic bag which he did not have when apprehended. A day or two after the robbery, Mack found a blue and white plastic bag in "the exact same spot where" he had arrested appellant. Inside the bag were a bottle of wine and $180. Officer Mack testified that during his chase of appellant from the Comet Oil Station, he never lost "sight of [appellant]."

Police Corporal Gardner arrived at Comet Oil moments after the robbery. He obtained a latent fingerprint from a beer can found on the counter of the store, a can which Nettles believed had been handled by one of the suspects. Police Corporal Gene Roy, a fingerprint comparison expert, testified that the latent print found on the beer can was the fingerprint of appellant Ernest Glover.

Police Investigator Howard Wilson testified he went to Comet Oil immediately after the report of the robbery. He took $167.56 from Spencer's left front shirt pocket. Wilson testified that shortly after his arrest Glover told him and Detective Burns that he had "just [been] walking by the gas station and he saw someone run out of the station." (Burns corroborated Officer Wilson's testimony.) Wilson identified the handgun that Nettles had held on Spencer after the robbery, and an envelope containing the money he seized from Spencer at the scene.

The State and the defense stipulated that defendant Glover and his co-defendant Richard Spencer were arrested and pled guilty to a bank robbery in U. S. District Court in Savannah in 1975.

In defense, Glover stated that he just happened to be walking near the incident location when Officer Mack approached. He testified that he ran from the officer and that he had to try to keep the officer from "beating me to death." He was brought back to the store where he saw the victim Nettles, whom he had seen many times before "because I have been in that store quite a few times." He denied having been in the store during the robbery and denied making

the statement attributed to him by Detectives Wilson and Burns. He referred to the prosecution against him as a "frameup situation." He suggested Burns and Wilson were lying because they, like the prosecutor, just wished to obtain a conviction. He conceded to the prosecutor that he was calling all the State's witnesses liars. *Held*:

1. Appellant contends he was entitled to a directed verdict as to Count 3, possession of a firearm during the commission of a felony under OCGA § 16-11-106, on the ground that this offense is included in Count 1, armed robbery (OCGA § 16-8-41), and particularly since appellant was not shown to have a weapon during the commission of the robbery.

Appellant contends he is familiar with our controlling ruling in *Wilcox v. State*, 177 Ga. App. 596 (340 SE2d 243), but urges us to take another look at it, as "[s]omewhere in there is ground for [j]udicial correction." However, appellant has not suggested what such ground for correction might be. "Any person concerned in the commission of a crime is a party to it and may be convicted as a principal. OCGA § 16-2-20 (a); *Tolliver v. State*, 167 Ga. App. 696 (1) (307 SE2d 269). . . . An aider or abettor is such a person, as is one who encourages another to commit the crime. OCGA § 16-2-20 (b) (3) and (4). The evidence was sufficient to establish that appellant was concerned in . . . both of these ways in the commission of the crime of his co-defendant's actual possession of [a] firearm during commission of the armed robbery. Thus the jury was authorized to find appellant guilty as a principal." *Wilcox*, supra at pp. 596-597.

The two counts do not merge. It is clear the legislature specifically intended to provide separate and additional penalties for both the felony act, *whatever that might be*, and the possession of a firearm during the commission of it, as separate offenses. *Miller v. State*, 250 Ga. 436 (298 SE2d 509); *Wiley v. State*, 250 Ga. 343 (296 SE2d 714); *Wilson v. Zant*, 249 Ga. 373 (290 SE2d 442), cert. den. 459 U. S. 1092 (103 SC 580, 74 LE2d 940); *McKissic v. State*, 178 Ga. App. 23 (341 SE2d 903); *McGee v. State*, 173 Ga. App. 604 (327 SE2d 566). Considering the seriousness of both these offenses, it would demean legislative intent and encourage such criminal acts by diluting the penalty for them, if the heinous offense of possession of a firearm in the commission of a felony were forgiven, or merged, merely because the particular felony by technical definition involved a firearm.

2. Appellant contends the trial court erred in allowing evidence of a 1966 conviction for bank robbery, because there was no similarity in transaction in that appellant's identity was not proved in the 1966 armed robbery, and because the evidence placed his character in evidence.

The record shows clearly that while being questioned about a liquor violation in South Carolina, appellant himself volunteered the

information that he had been convicted of bank robbery. He admitted he was the same person named in the exhibit of conviction. Appellant placed his own character into evidence by stipulating to a 1975 bank robbery, and then blurting out that he was convicted of bank robbery in 1966, all the while protesting that he had not done anything but "try to do good." By all this, appellant himself called in the evidence of the 1966 bank robbery conviction and specifically brought it up. See *Language v. State*, 169 Ga. App. 649 (314 SE2d 485). There was no error in the admission of this evidence, on any ground.

3. Appellant complains the trial court should have dismissed this jury and called in another, under *Batson v. Kentucky*, 476 U. S. 79 (106 SC 1712, 90 LE2d 69) because the State exhausted all its peremptory strikes against black persons.

We find no *Batson* violation requiring reversal in this case. The singular purpose of *Batson* and all cases of its kind is to prevent the imposition of a racially discriminatory jury upon the defendant. Regardless how the State disposed of its peremptory challenges, and whatever its reasoning, the incontrovertible fact is that its actions did not result in a racially discriminatory jury. Seven black persons sat on the jury and the alternate juror was black. We will not reason backwards to a finding of technical error from the clear fact of a jury that was per se racially unbiased, for that would be a perversion of justice and a violation of the State's right to fair trial, upon an empty technicality.

4. The evidence shows inter alia that, in addition to being immediately identified by the victim, appellant with another was seen robbing the store, by a policeman who recognized him from many years' acquaintance; and that when he ran from the store he was pursued by another policeman who never lost sight of him until he was apprehended. All the evidence in this case is amply sufficient to enable a reasonable juror rationally to find appellant guilty of the offenses charged, according to the standard of *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560).

*Judgment affirmed. Deen, P. J., concurs. Benham, J., concurs specially.*

BENHAM, Judge, concurring specially.

While I agree with the majority in Divisions 1, 2, and 4, and in the judgment of Division 3, I cannot agree with all that is said in Division 3 concerning the reason for the Supreme Court's decision in *Batson v. Kentucky*, 476 U. S. 79 (106 SC 1712, 90 LE2d 69).

Unquestionably, one purpose of *Batson* was to "prevent the imposition of a racially discriminatory jury upon the defendant," but I do not believe that was *Batson*'s only purpose. Another more important purpose was to improve the image of justice. It is not enough to

revere the symbol of justice depicted by a statue showing a blindfolded lady with the scales of justice in one hand and a sword in the other. We must raise the public's level of consciousness of the meaning of the statue in general and the blindfold in particular. The blindfold stands for the belief that justice is not a respecter of person or position, and that it does not tolerate the use of racially discriminatory conduct in any form in the courts of this nation. To countenance any infusion of racial discrimination in the trial process by governmental agencies is to tarnish the image of justice. Therefore, our abhorrence of racial considerations in the jury selection process is based on more than protecting a defendant's right to an unbiased jury. It is also based on the belief that race has no place in determining whether a citizen should be allowed to serve on a jury. To believe otherwise would sacrifice justice's image of impartiality.

For too long we summoned minority jurors to serve, gave them orientation speeches about the importance of service, allowed them to be questioned on voir dire about their fitness for service, and then sat back helplessly and watched them stricken from the jury panels through the peremptory process. *Batson*, at long last, brought an end to this horrible and unconscionable practice.

"The harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community. Selection procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice. [Cits.] Discrimination within the judicial system is most pernicious because it is 'a stimulant to that race prejudice which is an impediment to securing to (black citizens) that equal justice which the law aims to secure to all others.' [Cit.]" Id. at 476 U. S. 87.

The main opinion, by overemphasizing the number of minority jurors who actually served, misses the point which *Batson* sought to advance by stating, "In view of the heterogeneous population of our Nation, public respect for our criminal justice system and the rule of law will be strengthened if we ensure that no citizen is disqualified from jury service because of his race." Id. at 476 U. S. 99.

DECIDED SEPTEMBER 12, 1989.

*Stephen H. Harris*, for appellant.
*Spencer Lawton, Jr.*, District Attorney, *Gregory R. Jacobs*, Assistant District Attorney, for appellee.