## S03A1283. PITTMAN v. THE STATE.
(592 SE2d 72)

HINES, Justice.

Larry Don Pittman appeals his conviction for the malice murder of Karen Gazaway. He challenges the trial court's refusal to suppress his inculpatory statement to police, and the trial court's denial of a new trial based upon claims that the statement was illegal and that trial counsel was ineffective in attempting to suppress it. Finding the challenges to be without merit, we affirm.[1]

On the evening of July 10, 1998, Karen Gazaway's half-naked body was found lying face-up in the bathtub of her room at a motel in Marietta. Gazaway had been bound and gagged; her wrists were tightly tied to one ankle with a telephone cord and a pillowcase had been stuffed in her mouth. There was evidence of sexual intercourse.

---

[1] The murder occurred on July 10, 1998. On April 1, 1999, a Cobb County grand jury indicted Pittman for malice murder and felony murder while in the commission of aggravated assault. Pittman was tried before a jury October 31-November 7, 2000, and found guilty of both charges. On November 7, 2000, he was sentenced to life imprisonment for malice murder; the felony murder stood vacated by operation of law. *Malcolm v. State*, 263 Ga. 369, 371-372 (4) (434 SE2d 479) (1993). Trial counsel filed a motion for new trial on November 14, 2000. New appellate counsel filed an amended motion for new trial on April 29, 2002. The motion for new trial, as amended, was denied on August 29, 2002. A notice of appeal was filed on September 27, 2002, and the case was docketed in this Court on May 15, 2003. The appeal was argued orally on September 9, 2003.

Gazaway had various bruises and abrasions on her face and neck; she had a black left eye and numerous pinpoint hemorrhages in the right eye. There were several hemorrhages in the soft tissues on either side of her neck as well as in the muscles connecting the tongue to the trachea and larynx. There was also a prominent bite mark on her left shoulder. The cause of death was determined to be strangulation.

The evidence construed in favor of the verdicts showed that on or about July 9, 1998, Pittman rode with his boss, a trucker for a moving company, from Jacksonville, Florida to Marietta to deliver furniture. They arrived in the early evening and the boss reserved a room for the two at a local motel. Pittman made some acquaintances in an attempt to procure crack cocaine. Early in the morning of July 10, the acquaintances, Hollands, McDowell, and Woods, accompanied Pittman to the nearby motel where Gazaway was staying in order to buy the drugs. After the purchase, the four went to Gazaway's room to smoke the crack cocaine. Pittman and Gazaway went into the bathroom to smoke the crack cocaine, closing the door behind them. Hollands and McDowell knocked on the bathroom door, wanting a share of the drugs, but Pittman would not open the door, so the two left Gazaway's motel room. Woods remained. Pittman and Gazaway emerged from the bathroom, and Gazaway asked Woods to leave because she was tired of smoking, and wanted to have sex with Pittman and "just chill out." Gazaway was left alone in the room with Pittman. Approximately an hour later, Pittman called his boss and asked him to pick him up at another nearby motel. Pittman apologized to the boss for being late, explaining that he had been "partying." Following the furniture delivery, the two men returned to Jacksonville.

After investigation revealed Pittman's fingerprints on the telephone in Gazaway's room and evidence of Gazaway's encounter with Pittman, Marietta police detectives, Aiken and Duvall, traveled to Jacksonville to question Pittman. Before leaving, Detective Aiken informed local officers that he had a warrant for Pittman's arrest. After arriving in Jacksonville, the Marietta detectives first went with local police to Pittman's place of employment, but there they learned that Pittman had quit his job. They then went to Pittman's residence. Jacksonville police officers arrested Pittman and transported him to the Jacksonville police station. Once at the police station, Pittman was interviewed by Detectives Aiken and Duvall.

Pittman admitted to having sex with Gazaway, and to biting her and engaging in a struggle with her. He also admitted to choking Gazaway, putting a pillowcase in her mouth, tying her up with a telephone cord, and placing her in the bathtub before leaving the motel room. He maintained that Gazaway was alive when he left the room,

but admitted that he knew that "she was damn near out of air." He further stated, "Maybe because I had it around her, she don't breathe or something."

1. The evidence was sufficient to enable a rational trier of fact to find Pittman guilty beyond a reasonable doubt of the malice murder of Karen Gazaway. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Pittman contends that the trial court erred in not suppressing his statement under OCGA § 24-3-50[2] because it was induced by the hope of benefit. He argues that Detective Aiken enticed him into speaking by implicitly promising that his not intending to cause the homicide would result in mitigation of his charge and/or sentence, and that Aiken would intercede on his behalf and "work this." Pittman further urges that by telling him that he would not be "charged with drugs," Aiken implicitly conveyed that he had authority to make decisions regarding the charges against Pittman. But the contentions are unavailing.

The trial court found that the statement was voluntary as a matter of fact and as a matter of law; that it was not induced by either the slightest hope of benefit or the remotest fear of injury; and that it was voluntarily made by Pittman after he was fully informed of his constitutional rights under *Miranda*. A trial court's findings about the admissibility of a defendant's incriminating statement will be upheld on appeal unless clearly erroneous. *Daniel v. State*, 268 Ga. 9, 10 (2) (485 SE2d 734) (1997). Here, the record supports the trial court's findings.

Detective Aiken related to Pittman his view of how the killing happened and opined, "I don't think you knew that she had died. I think you tied her up thinking she was still alive and you placed her in the tub." Contrary to Pittman's characterization of this as an implicit promise that the charges against him and/or his punishment would be mitigated, this was nothing more than routine police questioning aimed at eliciting a response from a defendant in custody. *Rowe v. State*, 276 Ga. 800, 803 (2) (582 SE2d 119) (2003).

The detective's suggestion that Pittman may not have intended to kill the victim did not amount to a hope of benefit. *Tyler v. State*, 247 Ga. 119, 122 (2) (274 SE2d 549) (1981). *State v. Ritter,* 268 Ga. 108 (485 SE2d 108) (1997), cited by Pittman is inapposite. In *Ritter,* the police purposely misrepresented to the defendant that the victim was alive and actively recovering, thereby implicitly promising that the defendant would not be charged with murder. Id. at 110 (1). In

---

[2] OCGA § 24-3-50 provides: "To make a confession admissible, it must have been made voluntarily, without being induced by another by the slightest hope of benefit or remotest fear of injury."

this case, there were no misrepresentations made about the victim's status. Initially, Pittman was informed of his *Miranda* rights and he executed a written waiver of those rights, which clearly set forth that Pittman was being charged, inter alia, with homicide. What is more, Pittman made his statement after Detective Aiken repeatedly made plain that Gazaway was dead.

During the interview, Detective Aiken also urged Pittman to tell the truth so that he could "work this." In *State v. Roberts*, 273 Ga. 514 (543 SE2d 725) (2001), the police admonished the defendant to be truthful, stating " 'We can't help you like this.' " Id. at 516 (3). This Court emphasized that it "has held repeatedly that such admonitions to tell the truth will not invalidate a confession. [Cits.] 'The fact that a confession has been made under a spiritual exhortation, a promise of secrecy, or a promise of collateral benefit [will] not exclude it.' " Id. See also *Lee v. State*, 270 Ga. 798, 800 (2) (514 SE2d 1) (1999) (by talking to investigators, " '[a]ll you're going to do is help yourself out.' "); *Fowler v. State*, 246 Ga. 256, 258 (4) (271 SE2d 168) (1980) (statement by police that it would " 'behoove' " defendant to " '[shoot] straight with us.' "); *Wiley v. State*, 245 Ga. App. 580, 582-583 (3) (538 SE2d 483) (2000) (statement by victim's father that maybe they could " 'work this out' "). Moreover, Detective Aiken plainly told Pittman that he could not promise him anything other than that he would relate Pittman's version of events.

Finally, there is no merit to Pittman's claim that by telling him that there would not be drug charges against him, Detective Aiken led Pittman to believe that he had authority to make charging decisions. Detective Aiken informed Pittman that he would not be prosecuted on drug charges because there was "no evidence of the drugs." Thus, there was no benefit offered to induce an inculpatory statement. *Foster v. State*, 258 Ga. 736, 742 (8) (a) (374 SE2d 188) (1988).

3. Pittman next contends that the trial court erred in not suppressing his statement because under the totality of the circumstances the statement was not voluntary, and his waiver of *Miranda* rights was invalid under the Due Process Clauses of the State and Federal Constitutions. He argues that the statement was involuntary because he was not presented with or informed of any warrant, but rather was told that he was being arrested for "bad checks," and that once at the police station, he was not informed of the true charges he faced when he was given the *Miranda* warnings and waived his rights. But this challenge to the admission of the statement fails.

The fact that Pittman was not initially informed that he was being arrested for murder does not render his statement involuntary, so long as he was made aware of the right to remain silent and the right to have an attorney. *Horton v. State*, 258 Ga. 489, 490 (3) (371 SE2d 384) (1988). Pittman was fully advised of his *Miranda* rights

and executed a written waiver of those rights which, in fact, stated on its face that Pittman was being charged with homicide. See Division 2, supra.

In argument, Pittman also suggests that the behavior of the officers and other circumstances of his arrest and interrogation were "such as to overbear" his "will to resist and therefore bring about a confession that was not freely [self-determined]." However, the record does not support Pittman's portrayal of coercion by virtue of the physical circumstances surrounding the arrest and interview.

At the time, Pittman was 37 years old, and a high school graduate. When asked whether he had any difficulties with alcohol or drugs, Pittman responded, "none whatsoever." The exchange took place in a standard interview room at the Jacksonville police department. The interview began mid-morning and lasted approximately an hour and a half. Pittman was given something to drink. He was not hit or touched in any way, and he was uncuffed during the interview. Pittman did not request an attorney, and it did not appear that Pittman was suffering from any condition that would impair his understanding of the waiver of his rights. *Johnson v. State*, 271 Ga. 375 (519 SE2d 221) (1999).

4. There is no merit to Pittman's further contention that the trial court should have granted him a new trial because his inculpatory statement was the result of an illegal arrest. Citing, inter alia, *Payton v. New York*, 445 U. S. 573 (100 SC 1371, 63 LE2d 639) (1980), and *Brown v. Illinois*, 422 U. S. 590 (95 SC 2254, 45 LE2d 416) (1975), Pittman argues that his arrest was illegal because the officers entered his residence without consent, without a Florida warrant or a warrant under the Uniform Criminal Extradition Act (codified in Georgia as OCGA § 17-13-20 et seq.), and without informing him of the Georgia warrant for his arrest.

But even assuming arguendo that the arrest was illegal, this would not require the exclusion of Pittman's statement. Where probable cause exists, even an illegal, warrantless arrest in a suspect's home does not render inadmissible subsequent statements made outside the premises. *Carranza v. State*, 266 Ga. 263, 268 (2) (467 SE2d 315) (1996), citing *New York v. Harris*, 495 U. S. 14, 17 (110 SC 1640, 109 LE2d 13) (1990). Here, the Jacksonville officers arrested Pittman with full knowledge of the outstanding Georgia warrant charging Pittman with murder; therefore, they had probable cause to make the arrest. See *Wike v. State*, 596 S2d 1020 (1992).

5. Lastly, Pittman claims that the trial court erred in denying him a new trial because his trial counsel was ineffective for failing to raise the issue of his illegal arrest at the hearing on the motion to suppress Pittman's statement.

But,

[i]n order to prevail on a claim of ineffective assistance of counsel, a criminal defendant must show that counsel's performance was deficient and that the deficient performance so prejudiced the client that there is a reasonable likelihood that, but for counsel's errors, the outcome of the trial would have been different. *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984); *Smith v. Francis*, 253 Ga. 782 (1) (325 SE2d 362) (1985).

*Robinson v. State*, 277 Ga. 75 (586 SE2d 313) (2003). This Pittman cannot do. Pretermitting any question of a deficiency in counsel's performance for not making the claim of an illegal arrest, Pittman cannot show the reasonable likelihood that the outcome of trial would have been different but for counsel's omission inasmuch as such claim fails to provide a meritorious basis for suppression. Division 4, supra.

*Judgment affirmed. All the Justices concur.*

DECIDED JANUARY 12, 2004.

*Ruth P. Marks*, for appellant.

*Patrick H. Head, District Attorney, Eleanor A. Kornahrens, Dana J. Norman, Marion T. Woodward, Assistant District Attorneys, Thurbert E. Baker, Attorney General, Frank M. Gaither, Jr., Assistant Attorney General*, for appellee.