## S04A1873. FLANDERS v. THE STATE.
(609 SE2d 346)

THOMPSON, Justice.

Arkee Sheriff Flanders was convicted of malice murder, felony murder, and possession of a firearm during the commission of a felony, in connection with the shooting death of Jessica Tower.[1] On appeal, Flanders asserts, inter alia, that the trial court gave an improper charge on malice murder allowing the jury to infer intent to kill from the use of a deadly weapon. We agree that the charge was erroneous, however, we hold that the error was harmless. We find no reversible error in Flanders' other contentions.

Construed to support the verdict, the evidence showed that Jessica Tower was shot in the head at close range with a .380 caliber semiautomatic pistol while she was sitting alone in her car in the

---

[1] A grand jury indicted Flanders on June 11, 1998, and charged him with malice murder, felony murder predicated on the underlying felony of aggravated assault, possession of a firearm during the commission of a felony, theft by taking for the taking of money from Jessica Tower, and both burglary and theft by taking for the unlawful entry and taking of property from the dwelling house of Ray Harris. Trial commenced on April 20, 1999; four days later, a jury found Flanders guilty of all charges, except for the burglary and theft counts relating to Harris. The felony murder conviction was vacated as a matter of law, *Malcolm v. State,* 263 Ga. 369 (4) (434 SE2d 479) (1993), and the trial court sentenced Flanders to life in prison for malice murder, plus a concurrent term of 12 months. Flanders' timely motion for new trial was denied on July 9, 2003. A notice of appeal was filed on July 30, 2003. The case was docketed in this Court on July 22, 2004, and submitted for a decision on briefs on September 13, 2004.

early morning hours. The car lurched forward and subsequently crashed into a nearby building where the police later found it.

Flanders, an ex-boyfriend of Jessica's sister, Erica Tower, was a suspect in a theft of money from Jessica's residence three weeks earlier. On that occasion, after a fight between Flanders and Erica at the Towers' home, Flanders entered Jessica's car and stole $377 from her purse. Jessica called the police and made a full report of the theft, and the police questioned Flanders about the stolen money. Flanders initially denied knowledge of the theft, but later admitted taking the money.

Jessica did not pursue prosecuting Flanders; instead she attempted to arrange for the return of the money without his arrest. On the night in question, Flanders was on his way home from a nightclub when he telephoned Jessica and proposed that they meet in Shaw Park where he would return the money. Flanders took with him a Larson .380 semiautomatic handgun, which had been left at his home by a friend the previous day. Jessica drove to Shaw Park and pulled her car up to Flanders so that he was standing on the passenger side. She rolled down the passenger window. Flanders, who was armed with the gun, leaned into Jessica's car and from a distance of about six inches, shot Jessica in the head. Flanders did not attempt to render aid to Jessica; instead, he ran from the scene.

Later that morning, Flanders hid the weapon under a friend's mattress. That afternoon, Flanders was picked up for questioning concerning the shooting. He received *Miranda*[2] warnings and agreed to talk to the officers. During the course of the lengthy interview, Flanders at first denied any knowledge of the shooting, and then attempted to implicate his friend. Finally, after making incriminating statements, Flanders admitted that he shot Jessica, but that the shooting had been accidental.

At trial, Flanders admitted to taking the money from Jessica; that he chose Shaw Park as the location for their meeting; and although he told Jessica he would return some of the money to her at their meeting, he did not do so before shooting her. Flanders continued to maintain that the shooting was an accident. The State's firearms expert testified that the gun required eight and one-half pounds of rearward pressure to fire which, according to the firearms expert, constituted "a heavy trigger pull."

1. The evidence was sufficient for a rational trier of fact to have found Flanders guilty beyond a reasonable doubt of the crimes for which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

---

[2] *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966).

2. Arguing that the State exercised a pattern of racially discriminatory strikes by striking all of the three African-Americans on the jury panel, Flanders asserts the trial court erred when it denied his *Batson*[3] challenge. We disagree.

> The evaluation of a *Batson* challenge involves a three-step process: (1) the opponent of a peremptory challenge must make a prima facie showing of racial discrimination; (2) the proponent of the strike must then provide a race-neutral explanation for the strike; and (3) the court must decide whether the opponent of the strike has proven discriminatory intent.

*Thomas v. State*, 274 Ga. 156, 161 (5) (549 SE2d 359) (2001). A trial court's finding as to whether the opponent of a strike has proven discriminatory intent is entitled to great deference and will not be disturbed unless clearly erroneous. *Barnes v. State*, 269 Ga. 345 (6) (496 SE2d 674) (1998).

Flanders made a prima facie case of racial discrimination by establishing that the State struck all of the African-American jurors on the panel. The State then proffered its reasons for each of the strikes.

The State explained it struck the first prospective juror because his recollection abilities were called into question when he could not remember on what type of jury he had previously served; his service would create an extreme hardship because he was required to care for a dependent aunt; and he would find the evidence too offensive. These explanations are race-neutral, related to the case to be tried, and are all clear and reasonably specific reasons for exercising the challenge. *Gamble v. State*, 257 Ga. 325 (5) (357 SE2d 792) (1987). See also *Sears v. State*, 268 Ga. 759 (8) (493 SE2d 180) (1997) (hardship imposed on mother of dependent infant is race-neutral reason for exercising peremptory challenge).

The State struck the second prospective juror because her son recently had been prosecuted for a DUI. The prior conviction of a family member is a sufficiently race-neutral reason to exercise a peremptory strike. *Henry v. State*, 265 Ga. 732 (2) (462 SE2d 737) (1995).

The prosecutor explained that he struck the third prospective juror because of her employment as a social worker, and that it is the practice of his office to strike jurors with backgrounds in social work

---

[3] *Batson v. Kentucky*, 476 U. S. 79 (106 SC 1712, 90 LE2d 69) (1986).

and psychology.[4] This has also been held to be a race-neutral explanation. *Askew v. State*, 254 Ga. App. 137 (9) (564 SE2d 720) (2002). See also *Roundtree v. State*, 257 Ga. App. 810 (2) (572 SE2d 366) (2002); *Horne v. State*, 237 Ga. App. 844 (4) (517 SE2d 74) (1999) (employment in social work one of several race-neutral reasons for excluding juror).

Flanders failed to carry his burden of proving purposeful discrimination. See *Foster v. State*, 272 Ga. 69 (5) (525 SE2d 78) (2000); *Williams v. State*, 271 Ga. 323 (2) (519 SE2d 232) (1999). It follows that the trial court did not err in denying Flanders' *Batson* motion. *Barnes*, supra at 345 (6).

3. We reject Flanders' assertion that his statement to the police was induced with the hope of benefit, and therefore involuntary. The investigating officer testified at a *Jackson v. Denno*[5] hearing that Flanders was not under arrest at the time he gave the statement, that he was nonetheless advised of his *Miranda* rights and appeared to understand them, and that he was not threatened, coerced, or promised anything in return for his statement.

Flanders did not testify at the hearing or provide a specific basis for excluding his statement. And nothing in the record suggests the investigating officers coerced Flanders either by threats to his mother or by threats as to the length of time they would keep him at the police station. *Pittman v. State*, 277 Ga. 475 (2) (592 SE2d 72) (2004).

The trial court determined that Flanders was advised of his constitutional rights, that he knowingly and voluntarily relinquished those rights, and that his subsequent statements were voluntary. Considering the totality of the circumstances, that determination is not clearly erroneous. *Atkins v. State*, 274 Ga. 103 (4) (549 SE2d 356) (2001).

4. Any assertion that first appellate counsel was ineffective for failing to challenge the admissibility of Flanders' statement is rendered moot by our ruling in Division 3.

5. Flanders asserts that his statement to the police was a confession which the State failed to corroborate at trial.

The State cannot rely solely on Flanders' statement to prove its case. "If [the] statement is an admission, the State must present additional direct or circumstantial evidence of his guilt of felony murder. [Cit.] If the statement is a confession, the State must introduce additional evidence which corroborates it. OCGA § 24-3-53." *Walsh v. State*, 269 Ga. 427, 429 (1) (499 SE2d 332) (1998). "An

---

[4] In fact, the prosecutor stated his intention to strike a Caucasian juror on the subsequent panel for exactly the same reason, and the record reflects that was done.

[5] 378 U. S. 368 (84 SC 1774, 12 LE2d 908) (1964).

admission differs from a confession in that a confession acknowledges all of the essential elements of the crime." Id.

Flanders admitted to the police that he called Jessica and arranged the meeting at Shaw Park; that he came armed with the .380 pistol because he thought she may bring a companion in an attempt to ambush him; that he waited for her to drive up and then approached the front passenger window; and that he leaned inside with the gun in hand. Flanders stated that he "forgot [the gun] was in my hand . . . and it just went off." Although felony murder does not require malice or intent to kill, it does, however, "require that the defendant possess the requisite criminal intent to commit the underlying felony." *Holliman v. State*, 257 Ga. 209, 210 (1) (356 SE2d 886) (1987). Since Flanders did not admit the underlying aggravated assault, his statement was in the nature of an admission. The State satisfied its burden of introducing sufficient direct and circumstantial evidence of his guilt of malice and felony murder by showing that the gun which Flanders carried to the scene was the same gun that fired the fatal shot, that he had access to the weapon, and that he arranged the meeting with Jessica. Even if corroboration were required, the State produced sufficient evidence of the other material elements of malice and felony murder to provide the necessary corroboration. See *Walsh*, supra at 430 (corroboration requirement is satisfied by "the existence of additional evidence which corroborates [a] confession in any particular"). See also *Chapman v. State*, 275 Ga. 314 (2) (565 SE2d 442) (2002); *Sands v. State*, 262 Ga. 367 (1) (418 SE2d 55) (1992).

6. It follows that the trial court did not err in refusing to give a requested charge on the principle of corroboration since such a charge was not adjusted to the evidence.

7. During opening statement, defense counsel opined that the lead detective did not believe that Flanders "knew how to handle that particular gun, much less pull the trigger. So I think when you hear the evidence, the State's own detective . . . believed that it was an accident." During the State's direct examination of the detective, the prosecutor asked, "Did you ever in your own mind feel like this was — was there any way that this was an accident?" The trial court allowed the question, over objection, because it was raised in opening statement by the defense.

Clearly, Flanders' counsel opened the door to testimony to the subject by suggesting during opening statement that the detective believed the shooting to be accidental. See generally *Whitt v. State*, 257 Ga. 8 (2) (a) (354 SE2d 116) (1987). Moreover, even if the trial court erred in admitting the statement of the detective, it was cumulative of earlier testimony admitted without objection. The State's ballistics expert, who testified before the lead detective, was

asked whether the weapon was "subject to accidental firing." She responded: "the only way that that weapon would fire for me was by pulling the trigger. It would not fire any other way." Flanders did not object to this statement. Thus, error if any, in allowing the detective's testimony is harmless. See *Rose v. State*, 275 Ga. 214 (4) (563 SE2d 865) (2002); *Gordon v. State*, 273 Ga. 373 (4) (c) (541 SE2d 376) (2001); *Johnson v. State*, 270 Ga. 234 (4) (507 SE2d 737) (1998).

8. The trial court charged the jury:

You may infer that a person of sound mind and discretion intends to accomplish the natural and probable consequences of that person's intentional acts. And if a person of sound mind and discretion intentionally and without justification uses a deadly weapon or instrumentality in the manner in which the weapon or instrumentality is ordinarily used and thereby causes the death of a human being, you may infer the intent to kill.

At the time of Flanders' trial in 1999, this was considered a proper, although discouraged, charge. Subsequently, in *Harris v. State*, 273 Ga. 608 (2) (543 SE2d 716) (2001), this Court ruled the charge to be erroneous. When *Harris* was decided, the present case was pending on direct review. *Harris* expressly provides that the rule "will be applied to all cases in the 'pipeline' — i.e., cases which are pending on direct review or not yet final." Id. at 610 (2). Unlike *Harris*, the evidence of malice in this case is overwhelming, and, therefore, it is highly probable that the error did not contribute to the verdict. Thus, the error is harmless. See *Franks v. State*, 278 Ga. 246 (6) (599 SE2d 134) (2004); *Fulton v. State*, 278 Ga. 58 (4) (597 SE2d 396) (2004); *Scott v. State*, 275 Ga. 305 (5) (565 SE2d 810) (2002).

*Judgment affirmed. All the Justices concur.*

BENHAM, Justice, concurring.

While agreeing with everything written in the majority opinion, I write separately to highlight the importance of ensuring that the jury selection process remains free not only of racial and gender prejudice, but also free of racial and gender stereotypes. In addition, I write separately to remind the bench and bar of the adverse effects a discriminatory jury selection process has on the community and the judicial system.

Seldom do we, as judges, recount personal experiences in an opinion, but sometimes it is necessary to explain the importance of a legal issue. I believe an experience I had while in private practice drives home the point I wish to make about the jury selection process, so I share it here.

Prior to the U. S. Supreme Court's decisions in *Batson v. Kentucky*, 476 U. S. 79 (106 SC 1712, 90 LE2d 69) (1986), and *J. E. B. v. Alabama*, 511 U. S. 127 (114 SC 1419, 128 LE2d 89) (1994), while a lawyer and president of my local bar association, I witnessed female and minority jurors routinely being struck through the use of peremptory challenges with no explanation being given by the lawyer exercising the strike. As I sat observing court proceedings on one particular occasion, a peremptorily-stricken female minority juror approached me during recess and stated she knew she had been struck purely because of race and asked me what could be done. After expressing sympathy for her plight, I informed her lawyers had a right to peremptorily strike jurors for any reason as long as they did not engage in a pattern and practice of striking jurors on the basis of race or gender.

In response to my statement, the lady informed me that she had been humiliated by the whole process and that she saw the court system as sending a message to her that, because of her race, the legal system did not deem her fit to sit in judgment of her fellow citizens. She further stated, "The next time I receive a jury summons, I will call and say I am sick. The next time law enforcement officers ask for my help in investigating a crime, I will say I am busy. The next time the government needs my help, I will be unavailable."

Such a statement shocked me, but I realized it reflected some of the real evils that result from an abuse of the exercise of peremptory strikes. The attitude she expressed is exactly what happens when people lose faith and confidence in our legal system. The spirit of cooperation is snuffed out and the government loses one of its most valuable resources, citizen input.

It is because of this fear of losing input from a cross-section of the community that I raise legal, ethical and professionalism concerns in the area of *Batson* challenges. Although lawyers are sometimes allowed to use fanciful reasons for the exercise of peremptory strikes, they may do serious harm to our legal system by eroding faith and confidence in the administration of justice.

Justice Anthony Kennedy, the author of *Batson v. Kentucky*, spoke at the dedication of the State Bar Headquarters of Georgia on January 15, 2005. He stated, "Jurors are one-time players in the governmental arena." Since jury service is a one-time event for most citizens, we can assume they are highly impressionable and we, as lawyers, should work to ensure that they leave their encounter with a good impression, not only of the case in controversy, but also of the entire legal system. If we, through the use of peremptory strikes, exclude, for suspect reasons, individual jurors or entire cognizable segments of the population from service, we add to the erosion of respect for and confidence in our system of justice.

Jury service is one of the most highly regarded privileges of civic life. Jury duty preserves the democratic element of the law as it guards the rights of participants in the legal system and ensures continued acceptance of the nation's laws. *Powers v. Ohio*, 499 U. S. 400, 407 (111 SC 1364, 113 LE2d 411) (1991). It affords many citizens a valuable opportunity to participate in a process of government which one hopes, fosters a respect for the law. Id. With the exception of voting, jury service may provide a citizen with his or her most significant opportunity to participate in the democratic process. Id.

For many years the judiciary has recognized the terrible effects of a discriminatory jury selection process. Over a century ago, the U. S. Supreme Court acknowledged,

> the very fact that [members of a particular race] are singled out and expressly denied . . . all right to participate in the administration of the law, as jurors, because of their color, though they are citizens, and may be in other respects fully qualified, is practically a brand upon them, affixed by the law, an assertion of their inferiority, and a stimulant to that race prejudice which is an impediment to securing to individuals of the race that equal justice which the law aims to secure to all others.

*Strauder v. West Virginia*, 100 U. S. 303, 308 (25 LE 664) (1879). Today, we are well into the Twenty-first Century and some citizens of this country are still not free from insidious discrimination during the jury selection process. While the constitutions of the United States and Georgia demand the total uncompromising neutrality of the jury selection process, some people remain unable to fulfill their role in the administration of justice because of the discriminatory use of peremptory challenges. *Lingo v. State*, 263 Ga. 664, 675 (437 SE2d 463) (1993).

The harm from the discriminatory use of peremptory strikes in the jury selection process extends well beyond that inflicted on the excluded juror. *Batson v. Kentucky*, supra, 476 U. S. at 89. There is also injury to the jury system, to the law as an institution, and to the overall democratic idea reflected in the process of the courts. *Ballard v. United States*, 329 U. S. 187, 195 (67 SC 261, 91 LE 181) (1946). Because the right to a jury trial includes the right to a jury drawn from a fair cross-section of the community, the right to a neutral and impartial jury belongs to the community as well. *State v. McCollum*, 261 Ga. 473, 477 (405 SE2d 688) (1991). Selection procedures that purposefully discriminate against certain people raise questions in the community as to the fairness of the proceedings conducted there and erode the public's respect for the process. *Edmonson v. Leesville*

*Concrete Co.*, 500 U. S. 614, 628 (111 SC 2077, 114 LE2d 660) (1991). When courts allow jurors to be excluded as a result of discrimination, the courts become participants in the ultimate harm, a scheme that undermines the very foundation of our judicial system — the community's confidence in it. *McCollum*, supra at 478.

The overall integrity of the jury selection process, and thereby the entire judicial system, is enhanced when fitness for jury service is not determined through a discriminatory process. See *Hayes v. State*, 261 Ga. 439, 449 (405 SE2d 660) (1991). For too long we summoned jurors to serve, gave them orientation speeches about the importance of service, questioned them on voir dire about their fitness for service, and then allowed them to be stricken from jury panels through the discriminatory use of peremptory strikes. *Glover v. State*, 192 Ga. App. 798, 802 (386 SE2d 699) (1989). There stands a compelling public interest in protecting the integrity of the jury selection process and in enforcing citizens' rights to fulfill their civic role through jury service untainted by discrimination. *McCollum*, supra at 478. By requiring courts to be responsive to the discriminatory use of peremptory strikes, our decision enforces the mandate of equal protection and reinforces the community's confidence in the judicial system. *McGuire v. State*, 185 Ga. App. 233, 240 (363 SE2d 850) (1987).

DECIDED FEBRUARY 21, 2005.

*Zell & Zell, Rodney S. Zell*, for appellant.

*Patrick H. Head, District Attorney, Dana J. Norman, Assistant District Attorney, Thurbert E. Baker, Attorney General, Frank M. Gaither, Jr., Assistant Attorney General*, for appellee.