A07A2213. NELSON v. THE STATE.

(657 SE2d 263)

PHIPPS, Judge.

Following the denial of his motion for new trial, Wesley Nelson appeals his conviction of armed robbery. He complains of the trial court's determination at a *Jackson v. Denno*[1] hearing that a statement he made to police could be admitted at trial for the jury's consideration. He raises issues concerning the trial court's denial of

---

[1] 378 U. S. 368 (84 SC 1774, 12 LE2d 908) (1964).

his *Batson v. Kentucky*[2] challenge to the state's use of peremptory jury strikes. He contends that the trial court erred in denying his motion for funds to employ a psychologist to assist in his defense. And he charges his trial lawyer with ineffective assistance in failing to provide the prosecution with pretrial notice of the defense's intent to support its coercion defense with evidence of his accomplice's violent acts against third parties. We find no reversible error and affirm.

Nelson was charged with the armed robbery of John Watts, owner and operator of a convenience store known as the Tomato Bin. Watts testified that on January 15, 2006, two young men wearing sweatshirts with hoods covering their heads appeared at his store. One of the men opened his jacket to partially reveal a device having the appearance of a gun and demanded money. The other man grabbed the money from Watts. The two men then fled the scene.

The following month, one of the young men, Devin Kimble, was arrested in connection with the investigation of a series of burglaries. That investigation also revealed that Nelson and Kimble had told a friend, Colby Martin, that they had robbed the Tomato Bin. As a result, Kimble was taken into custody.

Police investigator Donna Kimbrell also obtained warrants to arrest Nelson and to search his residence. The warrants were executed on the morning of February 5, 2006. When the patrolmen arrived, Nelson's mother was asleep downstairs and Nelson was asleep in his bedroom upstairs. Kimbrell arrived as patrolmen were handcuffing Nelson in his bedroom. Kimbrell told Nelson that she was investigating burglaries in the area as well as the robbery at the Tomato Bin. According to Kimbrell, Nelson responded, "I don't have anything to do with those burglaries, I know nothing about that; the robbery is on me, but I don't have anything to do with any burglaries." Nelson was then taken downstairs with his mother. After helping other officers search Nelson's bedroom, Kimbrell went downstairs and informed Nelson of his *Miranda* rights in his mother's presence. He responded that he did not have anything to say.

The next morning, however, Kimbrell realized that Nelson had been wearing a hooded sweatshirt that fit the description of one worn by one of the Tomato Bin robbers. To retrieve the sweatshirt as evidence, Kimbrell went to the cell where Nelson was being held pending his first appearance hearing. When she got the sweatshirt from him, he told her that he wanted to talk to her about the robbery. Kimbrell read Nelson his *Miranda* rights again, and he said that he still wanted to talk to her. He was, therefore, taken to the police station, where Kimbrell again informed Nelson of his *Miranda*

---

[2] 476 U. S. 79 (106 SC 1712, 90 LE2d 69) (1986).

rights. After Nelson signed a written form acknowledging that he understood those rights, Kimbrell conducted a videotaped interview of him. During the interview, he admitted his involvement with Kimble in the Tomato Bin armed robbery and in one of the burglaries.

In his opening statement at trial, defense counsel commented that part of Nelson's defense would be to show that Kimble had a history of bullying and threatening others into committing crimes with him. Afterward, the state moved in limine to prohibit the defense from presenting any evidence of acts of violence by Kimble toward third parties based on failure of the defense to provide pretrial notice of its intent to present such evidence. After hearing argument from counsel, the trial court, citing *Heaton v. State*,[3] opined that such evidence amounted to inadmissible "specific bad acts" evidence. The court, however, deferred ruling on the question until such time as the defense sought to admit such evidence at trial.

Later during the trial, Kimble, who had pled guilty to the armed robbery, testified that Nelson had concocted the idea to commit the robbery as they were walking to the convenience store, and that the gun in Nelson's possession at the time was actually a BB gun. Martin, who knew both Nelson and Kimble, appeared at trial as a defense witness. On direct examination, without objection by the state, he gave nonresponsive testimony that Kimble was a bad person, that he had a history of threatening people, and that he had tried to get Martin to help him commit one of the burglaries. In his trial testimony, Nelson admitted participating in the armed robbery of the Tomato Bin but claimed that he had done so only because Kimble had physically threatened him and his mother if he did not assist Kimble in the crime. Nelson testified that although he displayed a BB gun during the robbery, Kimble was in possession of a concealed firearm.

1. Nelson, who was 15 years old and in the tenth grade when he was questioned by the police investigator, contends that the trial court erred in ruling at the *Jackson v. Denno* hearing that his statements in the videotaped interview were made following a knowing and voluntary waiver of his constitutional right against self-incrimination.

"The question of a voluntary and knowing waiver depends on the totality of the circumstances and the state has a heavy burden in showing that the juvenile did understand and waive his rights. Confessions of juveniles are scanned with more care and received with greater caution."[4] But

---

[3] 214 Ga. App. 460, 461 (2) (448 SE2d 49) (1994).

[4] *In the Interest of M. M.*, 235 Ga. App. 109, 110 (1) (508 SE2d 484) (1998) (punctuation and footnotes omitted).

[a]ge alone is not determinative of whether a person can waive his rights. Instead, the question of waiver must be analyzed by a consideration of several factors. These are (1) age of the accused; (2) education of the accused; (3) knowledge of the accused as to both the substance of the charge and the nature of his rights to consult with an attorney and remain silent; (4) whether the accused is held incommunicado or allowed to consult with relatives, friends or an attorney; (5) whether the accused was interrogated before or after formal charges had been filed; (6) methods used in interrogations; (7) length of interrogations; (8) whether vel non the accused refused to voluntarily give statements on prior occasions; and (9) whether the accused has repudiated an extra judicial statement at a later date.[5]

When arrested the day before his interview, Nelson refused to talk to the police after being given *Miranda* warnings in the presence of his mother. Thus, as was the 15-year-old defendant in *Attaway v. State*,[6] "he appeared to be of sufficient maturity and intelligence to understand both the seriousness of the charges and his *Miranda* rights."[7] The following morning, however, he told the officer that he wanted to talk to her about the case when she came to his cell to retrieve evidence in his possession. The officer conducted a video-taped interview of Nelson after she gave him *Miranda* warnings twice again. The interview took place after Nelson's arrest but before formal charges were filed and lasted for less than two hours. As found by the trial court, there was no impropriety in the officer's interrogation method. As testified to by the officer, Nelson did not request the presence of a relative or an attorney during the interview, and the officer did not induce him to give the interview through any threats or promises. Also, although Nelson testified at trial that he had been acting under duress brought to bear by the officer, he did not repudiate his earlier statement to her about what he had done. Applying the factors set forth above to the totality of these circumstances, we find no error in the trial court's conclusion that Nelson knowingly and intelligently waived his constitutional rights and voluntarily made the statements at issue.[8]

---

[5] *Murray v. State*, 276 Ga. 396, 397 (2) (578 SE2d 853) (2003) (citations and punctuation omitted).

[6] 244 Ga. App. 5 (534 SE2d 580) (2000).

[7] Id. at 7 (citations omitted).

[8] See *Swain v. State*, 285 Ga. App. 550, 553 (647 SE2d 88) (2007); see generally *State v. Woods*, 280 Ga. 758, 759 (632 SE2d 654) (2006).

2. Nelson charges the trial court with error and his trial lawyer with ineffective assistance as a result of the denial of his *Batson* challenge.

In *Batson*, "the United States Supreme Court held that the discriminatory use of peremptory challenges to exclude members of the defendant's race was a denial of equal protection."[9] *Batson* involved the state's use of peremptory challenges to remove members of a criminal defendant's race from the jury venire. In *Georgia v. McCollum*,[10] the United States Supreme Court extended the analysis of *Batson* to the peremptory challenges used by criminal defendants.

> The evaluation of a *Batson* challenge [or a *McCollum* challenge] involves a three-step process: (1) the opponent of a peremptory challenge must make a prima facie showing of racial discrimination; (2) the proponent of the strike must then provide a race-neutral explanation for the strike; and (3) the court must decide whether the opponent of the strike has proven discriminatory intent.[11]

> Once the opponent of the strike establishes a prima facie case of racial discrimination, the burden shifts to the proponent of the strike to articulate a race-neutral explanation for striking the jurors in question. At this step of the inquiry, the proponent of the strike is not required to enunciate an explanation that is persuasive, or even plausible. Rather, a neutral explanation means an explanation based on something other than the race of the juror. Unless a discriminatory intent is inherent in the proponent's explanation, the reason offered will be deemed race neutral. Furthermore, although the proponent of the strike must provide a clear and reasonably specific explanation of his legitimate reasons for exercising the challenges, what is meant by a legitimate reason is not a reason that makes sense, but a reason that does not deny equal protection.[12]

> Only after the opponent of a strike establishes a prima facie case of racial discrimination (step one), and the proponent thereof tenders a race neutral explanation (step two), should the trial court evaluate the persuasiveness of the

---

[9] *Willis v. State*, 201 Ga. App. 727, 728 (1) (411 SE2d 714) (1991).

[10] 505 U. S. 42 (112 SC 2348, 120 LE2d 33) (1992).

[11] *Thomas v. State*, 274 Ga. 156, 161 (5) (549 SE2d 359) (2001) (citation omitted).

[12] *Jackson v. State*, 265 Ga. 897, 898-899 (2) (463 SE2d 699) (1995) (citations, punctuation and footnote omitted).

justification for exercising the strike and determine whether the opponent of the strike has carried his burden of proving purposeful discrimination[ ] (step three).... At stage [three], implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination.[13]

During step three of a *Batson/McCollum* challenge, "[t]he opponent of the strike may carry its burden of persuasion by showing that similarly-situated members of another race were seated on the jury."[14] Conversely, the party exercising the strike may justify it by showing that similarly-situated members of another race were also struck. "A trial court may also determine that improper discriminatory motive underlay the exercise of a peremptory challenge when the race-neutral explanation proffered by the strikes' proponent is so implausible or fantastic that it renders the explanation pretextual."[15] Cases involving *McCollum* challenges have resulted in reversals where the trial court either (1) improperly determined at step two that reasons proffered by the defense for counsel's exercise of peremptory challenges were not race-neutral and ended its inquiry; or (2) combined steps two and three, thereby improperly shifting the ultimate burden of proof to the defendant as the striking party.[16] "The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike."[17] "A trial court's finding as to whether the opponent of a strike has proven discriminatory intent is entitled to great deference and will not be disturbed unless clearly erroneous."[18]

Following the voir dire questioning of jurors at the beginning of Nelson's trial, defense counsel invoked *Batson* to challenge the prosecution's use of five out of nine peremptory jury challenges to remove five out of seven or eight African-Americans from the jury venire. This resulted in a jury that, as stated by the trial court, was "a hundred percent white." Finding that the defense had made a prima facie showing of racial discrimination, the court asked the prosecutor to explain his exercise of his peremptory strikes of the five jurors.

Without rebuttal by the defense, the prosecutor stated that he had struck the first two prospective jurors because one had a spouse

---

[13] Id. at 899 (citation and punctuation omitted).

[14] *Turner v. State*, 267 Ga. 149, 151 (2) (476 SE2d 252) (1996) (citation omitted).

[15] Id. (citations omitted).

[16] See *Williams v. State*, 249 Ga. App. 292 (548 SE2d 63) (2001) and cits.

[17] *Chandler v. State*, 266 Ga. 509, 510 (2) (467 SE2d 562) (1996) (punctuation and footnote omitted).

[18] *Flanders v. State*, 279 Ga. 35, 37 (2) (609 SE2d 346) (2005) (citation omitted).

and the other had a nephew, both of whom were incarcerated.[19] In addition, the second prospective juror had previously served on a deadlocked jury in a criminal case.

When the prosecutor explained that he struck the third juror because his first cousin was incarcerated on an armed robbery conviction (the same crime charged in this case), defense counsel responded that the juror had indicated that he was not biased as a result of this because he did not have a close relationship with his cousin and felt that his cousin had been treated fairly in any event.

The prosecutor then explained that he had struck the fourth juror because he was from a foreign country and his son had been charged with carrying a concealed weapon. The prosecutor further explained that he was concerned about the juror's country of origin, because he had previously prosecuted a case that, in his opinion, resulted in a deadlocked jury because a naturalized citizen serving as a juror insisted on applying a more stringent standard than the "beyond a reasonable doubt" test. As to this jury challenge, defense counsel argued that this juror had also indicated that he could be fair and unbiased notwithstanding his son's history and that striking a juror based on his country of national origin violated the spirit of *Batson*.

Finally, the prosecutor stated that he had struck the fifth juror because he had two family members who had been charged with extremely serious crimes; one had been convicted and was serving a prison sentence, and the other had been acquitted. Again, defense counsel argued that these were not close relatives of the juror and that the juror had indicated that neither his relationship with them nor his knowledge of their cases would affect his ability to be fair and unbiased. Counsel also argued that the fact that a family member of this juror had been acquitted of a crime would tend to make him less biased.

The prosecutor then noted similarly-situated Caucasian jurors whom he had struck for the same reasons he had removed the African-American jurors. He also pointed out that he had depleted his peremptory challenges by exercising them against Caucasian as well as African-American jurors, leaving two African-Americans on the jury venire after he had exercised all of his strikes. The court thereupon overruled the defense challenges to the prosecutor's use of each of the peremptory strikes.

---

[19] See id. (prior conviction of a family member is a sufficiently race-neutral reason to exercise a peremptory strike); *Trigger v. State*, 275 Ga. 512, 514 (3) (570 SE2d 323) (2002) (having a relative with a pending criminal charge is a race-neutral reason for striking jurors), overruled in part on other grounds, *Wilson v. State*, 277 Ga. 195, 199 (2) (586 SE2d 669) (2003).

(a) Nelson first contends that the trial court erred in finding that the prosecutor's peremptory strikes against the third and fourth jurors were not racially discriminatory.

As to the third juror, Nelson argues that he successfully rebutted the prosecutor's explanation for that challenge by showing that the juror had stated that he did not have a close relationship with his incarcerated relative. But "[i]n the situation in which a racially-neutral reason for the strike is given, the trial court must ultimately decide the credibility of such explanation. . . ."[20] Considering the totality of the circumstances, we cannot say that the trial court's ruling that Nelson did not carry his burden of proof to show a discriminatory purpose in the state's exercise of this peremptory strike was clearly erroneous.[21]

Nelson argues that the prosecutor's reason for striking the fourth juror based on the fact that he was an immigrant was not race-neutral. We disagree. Although the United States Supreme Court has extended its holding in *Batson* to instances where peremptory strikes are exercised solely on the basis of gender,[22] *Batson* has not been extended to strikes based on national origin. Moreover, the prosecutor's other proffered explanation for striking this prospective juror, that his son had been charged with a crime, is unquestionably race-neutral.[23]

(b) Nelson charges his trial attorney with ineffective assistance in failing to present a step three argument that reasons given by the state for use of its peremptory strikes, even if race-neutral, were in fact pretextual. We find no merit in this complaint. A review of the transcript shows that, although defense counsel did not use the word "pretextual," he sought to rebut the prosecutor's explanations by arguing either that the strike was not race-neutral or that, considering the totality of the jury's responses to questions on voir dire examination, there was no factual basis for the strike. Therefore, counsel made a proper *Batson* challenge.

3. Nelson charges his trial lawyer with ineffective assistance in not providing the state with notice of intent to present evidence of prior acts of violence by Kimble against third parties, as required by Uniform Superior Court Rules (USCR) 31.1 and 31.6. We find no merit in this claim.

These rules require the defense to give pretrial notice of its intent to introduce evidence of specific acts of violence "by the victim"

---

[20] *Stokes v. State*, 281 Ga. 825, 829 (3) (642 SE2d 82) (2007) (citation omitted).

[21] *Roberts v. State*, 278 Ga. 541, 543 (2) (604 SE2d 500) (2004).

[22] *Tedder v. State*, 265 Ga. 900, 901 (2) (463 SE2d 697) (1995).

[23] *Trigger*, supra.

against third persons and are thus inapplicable here. Although the trial court deferred a final ruling on the admissibility of such evidence, its tentative conclusion that the evidence was inadmissible was not based on Nelson's failure to comply with the USCR. In any event, the evidence that Nelson claims counsel should have introduced consists of testimony given by Colby Martin at the hearing on Nelson's motion for new trial. Without objection by the state, Martin gave the same essential testimony at trial. Therefore, Nelson was not prejudiced by counsel's allegedly deficient performance. "In order to prevail on a claim of ineffectiveness of trial counsel, a defendant must show both that counsel's performance was deficient and that the deficiency was prejudicial to his defense."[24]

4. In reliance on *Ake v. Oklahoma*,[25] Nelson contends that the trial court erred in denying his request as an indigent defendant for funds to engage a psychologist to assist in his defense.

As a condition to the grant of such funds, however, *Ake* requires the defendant to make a preliminary showing that his sanity at the time of the offense would likely be a significant factor at trial.[26] Because Nelson made no such showing, the trial court did not abuse its discretion in denying his request.[27]

*Judgment affirmed. Johnson, P. J., and Mikell, J., concur.*

DECIDED JANUARY 25, 2008.

*Sonya R. Chachere-Compton*, for appellant.
*David McDade, District Attorney, James E. Barker, Assistant District Attorney*, for appellee.

---

[24] *Cross v. State*, 271 Ga. 427, 430 (3) (520 SE2d 457) (1999) (citations omitted).
[25] 470 U. S. 68 (105 SC 1087, 84 LE2d 53) (1985).
[26] *LaCount v. State*, 265 Ga. App. 352, 354 (2) (593 SE2d 885) (2004).
[27] See id. at 354-355.